Walter Lamar **PATE, Plaintiff,**

v.

Michael **PEEL, Defendant.**

No. 501CV70MCR.

United States District Court,
N.D. Florida,
Panama City Division.

March 31, 2003.

Walter Lamar Pate, pro se.

Caryl Sue Kilsinski, Robert Charles Brannan, Tallahassee, FL, for Defendant.

## ORDER

RODGERS, United States Magistrate Judge.

Plaintiff filed this case pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis* under the terms of the Prison Litigation Reform Act. The matter is before this court upon consent of the parties and referral by the district court pursuant to 28 U.S.C. § 636(c). (Doc. 46). Pending are Defendant's special report (doc. 24), which the court directed Defendant to file in response to Plaintiff's amended complaint (doc. 8), and Plaintiff's reply to the special report (doc. 27).[1] The

court previously advised the parties that Defendant's special report would be treated as a motion for summary judgment under FED.R.CIV.P. 56 and informed them of the importance and ramifications of Rule 56 summary judgment consideration. (Doc. 29).

### Background

Plaintiff, a state inmate at the time he initiated this case,[2] was housed at Apalachee Correctional Institution ("ACI") when the events giving rise to his amended complaint occurred. Plaintiff names as the sole defendant in this action Michael Peel, a nurse practitioner at ACI.

Plaintiff sets forth in his amended complaint the following allegations.[3] In 1985 he was diagnosed as being HIV [human immunodeficiency virus] positive and is "currently on a salvaged regimen [sic] of combination therapy, including 15 pills per day to battle this virus . . . ." (Doc. 8 at 7). Since 1998 Plaintiff's medical records have reflected that he also suffers from "bashful bladder syndrome" ("BBS"), a condition which prevents him from urinating in public or giving urine samples for drug screens. (*Id.*). Additionally, at the time Plaintiff contracted HIV he became infected with Hepatitis C, "a liver condition [ ] more critical than any other medical condition he suffers from." (*Id.*). Plaintiff began treatment at the Chronic Illness Clinic ("CIC") of the Department of

---

1. Also pending is Plaintiff's "Motion for Judicial Notice." (Doc. 51).

2. On November 25, 2002, Plaintiff filed a notice of change of address which indicates that he has been released from custody. (Doc. 56).

3. Because Plaintiff's amended complaint is signed under penalty of perjury it is treated as his sworn affidavit. *Sammons v. Taylor,* 967 F.2d 1533, 1545 n. 5 (11th Cir.1992); *Perry v.*

*Thompson,* 127 786 F.2d 1093, 1095 (11th Cir.1986). Nevertheless, a verified complaint's allegations are subject to the scrutiny that an affidavit receives from a court when a court is considering a summary judgment motion, i.e., conclusory statements of ultimate facts, conclusions of law, and statements unsupported by personal knowledge are not considered competent evidence to defeat summary judgment. *Murrell v. Bennett,* 615 F.2d 306, 310 n. 5 (5th Cir.1980).

Corrections ("DOC") in 1999 for his HIV and Hepatitis C conditions. (*Id.*).

Defendant was "privy" to Plaintiff's medical history but "purposely disregarded" it when he refused on January 8, 2001,[4] to issue Plaintiff a medical pass regarding his BBS, "as required by F.D.O.C. policy."[5] (Doc. 8 at 8). Plaintiff submitted a grievance with respect to this matter on January 9 which was denied and returned to him on January 19.[6] (*Id.*). On January 22, when Plaintiff presented to the CIC for treatment, Defendant asked him whether he had any concerns regarding the quality of his medical care in light of the grievance and whether he planned to continue to pursue his grievance. (*Id.*). When "Plaintiff responded [in] the affirmative the defendant became short in response and conveyed a serious attitude." (*Id.*). Defendant also informed Plaintiff "that his liver profile was elevated to the bad and that [there was] a significant decline in CD[4] blood cells (100) to the bad," which would be monitored closely. (*Id.*).

On January 25 the classification committee changed Plaintiff's job assignment to the field force squad, a position which involved very physically demanding work.[7] (*Id.*). Plaintiff informed the classification supervisor that he had a current, valid pass which restricted him from standing more than fifteen minutes at a time, and he explained that he therefore should not be assigned to such arduous work. (*Id.*). The supervisor advised Plaintiff that Defendant had canceled his pass and had cleared him for the field force squad; according to Plaintiff, Defendant must have taken these actions "between 22 Jan.—24 Jan. 2001." (*Id.*).

Plaintiff completed the first and second days of his field force squad assignment on January 30 and 31. The work required him to dig and remove tree stumps weighing over five hundred pounds. (*Id.*). The following two days, February 1 and 2, Plaintiff was required to handle approximately 16,800 pounds of potatoes, which included rebagging the potatoes into one hundred-seventy sacks each weighing one hundred pounds, then throwing the sacks onto a truck. (*Id.*). The evening of February 2 Plaintiff had severe abdominal pain and swelling in the region of his liver. He declared a medical emergency and was admitted to the ACI infirmary. (Doc. 9). Plaintiff was released from the infirmary the following morning but returned on February 4 complaining of "incredible pain." (*Id.*). Plaintiff was then transported to Jackson Memorial Hospital for tests, following which he was taken back to the

---

4. Although in his amended complaint Plaintiff does not identify the precise date of this event, the undisputed record reflects that Defendant refused to issue the pass on January 8, 2001. (Doc. 24, Exh. K).

5. All mentions in this order to the months January, February, March, and April refer to events occurring in the year 2001.

6. Plaintiff has attached his January 9 grievance to his amended complaint. (*See* doc. 8). In it he cites FLA. ADMIN. CODE 33–602.2045 in support of his claim of entitlement to a BBS pass. Plaintiff complains that he advised Defendant that without the pass he would be subject to punishment and forfeiture of gain time for failing to give a urine specimen for

drug testing. He also asks not to be seen by Defendant again because he "fear[s] both wrongful treatment [and] direct repercussions from" filing a grievance. (*Id.*). In denying the grievance, ACI chief medical officer Hau Huynh, M. D., informed Plaintiff that the medical department did not issue passes for BBS but rather that a procedure was in place to accommodate the condition and would be followed. (*Id.*).

7. According to a grievance attached to Plaintiff's amended complaint dated February 8 in which he protests his assignment to the field force squad, he previously had been assigned to less strenuous work as a welding aide. (*See* doc. 8). Dr. Huynh denied the grievance on February 15.

ACI infirmary. On February 5 Dr. Huynh advised Plaintiff that he was suffering from liver failure and discharged Plaintiff to the dormitory with instructions to rest. (*Id.*). On February 6, when Plaintiff continued to experience pain, Dr. Huynh referred him to Chattahoochee State Hospital for additional tests. Upon his return that day Plaintiff was placed in the ACI infirmary until his release to the general population on February 12. At the time of his discharge from the infirmary tests showed that Plaintiff's liver enzymes were "seriously elevated." He was issued medical passes which prescribed no prolonged standing and no lifting or pulling over twenty pounds. (*Id.*).

Plaintiff asserts two claims: (1) that Defendant retaliated against him for grieving his denial of a medical pass for BBS by removing Plaintiff's existing medical pass and clearing him for assignment to field work; and (2) that Defendant's actions constituted deliberate indifference to his known serious medical conditions. For the alleged violations of his rights under the First and Eighth Amendments [8] Plaintiff seeks compensatory and punitive damages and a written apology from Defendant.

In his special report Defendant argues that Plaintiff has failed to raise even a colorable suspicion of retaliation under the First Amendment.[9] (Doc. 24 at 16). First, according to Defendant, the evidence demonstrates that his January 22 decision approving Plaintiff for field force duty [10] was medically appropriate and proper based on Plaintiff's then-current condition. Moreover, Dr. Huynh, who reviewed and denied Plaintiff's February 8 grievance regarding his job reassignment, concurred with Defendant's medical judgment, as did the ACI Senior Health Services Administrator ("SHSA"). (*Id.* at 16, 23, citing Exh. C).[11] Second, as noted by

---

**8.** Plaintiff also alleges that Defendant "violated his substantive due process rights under the 14th Amendment by ... jeopardizing his physical health in retaliation for plaintiff's 1st Amendment use of the grievance process ...." (Doc. 8 at 8). The court concludes from this allegation, as well as from others (*see* doc. 27 at 5), that Plaintiff seeks to proceed directly under the Fourteenth Amendment and is not simply stating the precept that the First and Eighth Amendments apply to the states through the due process clause of the Fourteenth Amendment. As explained below in the "Discussion" section of this order, the court only considers Plaintiff's claims under the First and Eighth Amendments.

Also, the court does not consider independently Plaintiff's claims that Defendant's conduct was violative of provisions of the Florida Administrative Code which prohibit retaliation against inmates and which require that inmates be provided with adequate medical care. *See* FLA. ADMIN. CODE Rules 33–103.017 and 33–602.101(8) (2002). The court concludes that these claims are subsumed in Plaintiff's asserted violations of the First and Eighth Amendments and thus that they do not require separate analysis.

**9.** In support of his special report Defendant has submitted copies of Plaintiff's grievances (doc. 24, exhs.A–F), as well as excerpts of Plaintiff's medical records dated from November 1, 2000, through April 18, 2001 (*id.*, exhs. G–X, AA). In addition, Defendant has submitted his own affidavit and a copy of Plaintiff's change of job classification notice dated January 25. (*Id.* at Y and Z, respectively).

**10.** Defendant's clinical entry dated January 22 notes that Plaintiff was HIV positive and received medications three times daily. In clearing Plaintiff for unrestricted duty, Defendant wrote: "1) tentatively approved field force squad 2) will re-evaluate as needed." (*Id.*, Exh. L).

**11.** Dr. Huynh noted that "the decision to approve or deny Classification's request to place you on the field force squad or any other squad is based upon review and evaluation of your current health status. Although you have [an] extensive and complex past health history, your current status has actually been quite good." (*Id.*).

the SHSA in Plaintiff's medical record, Plaintiff's grievance regarding the denial of the BBS pass was "invalid," indeed was frivolous. The grievance therefore had absolutely no effect on Defendant's decision. (*Id.* at 16–17). Defendant's denial of the pass was mandatory, not discretionary, according to DOC directives which did not permit the issuance of a medical pass for BBS. Instead, as required, Defendant noted in the medical record Plaintiff's asserted inability to void in public.[12] Third, Plaintiff's medical records show that the CIC appointment at which Defendant allegedly was "short" with Plaintiff in discussing his grievance did not occur on January 22 as Plaintiff alleges. Rather, this appointment took place on January 23, which was after Defendant had already tentatively approved Plaintiff for work on the field force squad on January 22. (*Id.* at 18). Defendant maintains that Plaintiff has failed to raise factual allegations sufficient to demonstrate any intent to retaliate and thus that this claim should be dismissed. (*Id.* at 19).

Defendant argues that Plaintiff's Eighth Amendment claim also fails. Defendant contends that the evidence does not show that he disregarded a serious risk of harm to Plaintiff and that at most it simply demonstrates a difference in medical opinion. (*Id.* at 22). His decision to approve Plaintiff for work was based on his professional opinion that Plaintiff's medical condition permitted it: Plaintiff had a very muscular physique due to weight lifting; his conditions did not automatically preclude performing physical labor; and his medical records indicated that his conditions were stable at that time. (*Id.*). Moreover, Defendant specified on the rec-

ord that his approval was "tentative" and would be re-evaluated as necessary. Additionally, Dr. Huynh and the SHSA agreed with Defendant's work assignment decision. (*Id.* at 23). Dr. Huynh also opined in an April 3 entry in Plaintiff's medical records that there was no connection between Plaintiff's placement on the field force squad and any aggravation of his HIV or Hepatitis C conditions. (*Id.* at 25, citing Exh. W). Defendant also maintains that, contrary to Plaintiff's assertion, he did not assign Plaintiff to the field force squad; instead, although he approved placement for such an assignment, the final determination actually was made by the classification committee. Defendant maintains that the evidence shows that he was not deliberately indifferent to Plaintiff's serious medical condition and thus that his conduct was not violative of the Eighth Amendment.

Defendant also asserts his entitlement to Eleventh Amendment immunity and qualified immunity with regard to both of Plaintiff's claims, and he contends that Plaintiff is not entitled either to compensatory or punitive damages. (*Id.* at 28).

Plaintiff filed a reply to Defendant's special report, which includes a "declaration," a supplemental brief, and his own affidavit. (Doc. 27 at 1–3, 4–19, and 19–22, respectively, as numbered by the court). Plaintiff has also submitted additional medical records, including laboratory results from October 2000, from January–April 2001, and from as recently as October 2001. (*Id.* at 42–60). Attached to the reply are certain other records as well, such as an ACI change of classification notice dated July 8, 1999, assigning Plaintiff to work as a weld-

---

**12.** Defendant attaches to his special report a DOC policy recommendation which states that inmates should not be provided with "bashful bladder" passes but rather that the inmate's claim should simply be documented in his medical record. (Doc. 27, Exh. Y, Att.A). In addition, Defendant has supplied a copy of the DOC's Procedure 602.010, Bashful Bladder Procedure, which outlines the steps to be taken to obtain a urine specimen from an inmate who claims that he suffers from BBS. (*Id.*, Exh. Y, Att. C).

er, and one dated February 20 reassigning Plaintiff to work as a welder from his former position on the field force squad. (*Id.* at 25–60). For the most part Plaintiff's declaration, supplemental brief, and affidavit simply reiterate the allegations made in the amended complaint. Plaintiff also asserts that his ability to work, even after his release from incarceration, has been compromised by liver damage which he sustained as a result of the strenuous labor he was required to perform on the field force squad. Additionally, in his brief Plaintiff contends that Defendant has "manipulated" his extensive medical record of nearly 2000 pages by selectively presenting only certain documents with his special report. According to Plaintiff, he was treated by numerous specialists, whose prescribed treatments and passes Defendant fully complied with until the January 2001 events complained of in this action. (*Id.* at 10). Plaintiff asserts that Defendant "misrepresented facts and made perjur[iou]s statements in his special report and affidavit." (*Id.*). Plaintiff submits that for these reasons the court should not grant summary judgment in Defendant's favor or, in the alternative, that it should stay this matter "until necessary information is obtained" by him through discovery. (*Id.* at 19).

### Legal Standards

#### Summary Judgment

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A factual dispute is " 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." *Id.; accord Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994, 998 (11th Cir.1992). Evidence presented in opposition to the motion for summary judgment, and all factual inferences arising from it, must be viewed in the light most favorable to Plaintiff. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Jones v. Cannon,* 174 F.3d 1271, 1281 (11th Cir. 1999). To overcome a motion for summary judgment, the non-moving party must either point to evidence in the record or present additional factual evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Hammer v. Slater,* 20 F.3d 1137, 1141 (11th Cir.1994) (*en banc* ).

#### Qualified Immunity

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Vinyard v. Wilson,* 311 F.3d 1340, 1346 (11th Cir.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir.2002) (internal quotation marks and citations omitted). To receive qualified immunity, "the public official must first prove that he was acting within the scope of his discretionary authority when

the allegedly wrongful acts occurred." *Id.* (internal quotation marks omitted). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.*

█ The Supreme Court has set forth a two-part test for the qualified immunity analysis. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. "If a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.'" *Vinyard*, 311 F.3d at 1346 (quoting *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151).

### DISCUSSION

Before it commences its analysis of Plaintiff's claims, the court notes the following.

█ First, Plaintiff complains in his reply that Defendant has presented only selected medical records with his special report and has made false or misleading statements. Plaintiff does not, however, identify with any specificity the allegedly false or misleading statements in Defendant's special report or the medical records which Defendant should have provided. Plaintiff also does not explain how the statements or omissions of medical records misrepresent the facts of this case. Furthermore, at the time the court advised the parties that it would treat Defendant's spe-

cial report as a motion for summary judgment it specifically provided them with the opportunity to file motions for discovery if they wished; Plaintiff failed to do so. (*See* docs. 29 and 32). Accordingly, the court will not deny Defendant's motion for summary judgment on this basis or stay the instant matter, as Plaintiff has requested.

█ Second, Plaintiff filed a "Motion for Judicial Notice," in which he describes events occurring in July and August 2002 which involve Defendant. (Doc. 51). Plaintiff "asks this court to see a continued c[h]ronological order of events that show [a] record of continued retaliation and deliberate indifference." (*Id.*). The matters raised in Plaintiff's motion are not relevant to the claims in this action that Defendant retaliated against Plaintiff on January 22, 2001, by clearing him for field force duty and that Defendant was deliberately indifferent to his serious medical needs at that time. Plaintiff's motion is therefore denied.

█ Third, Plaintiff states in the amended complaint that he sues Defendant in both his individual and official capacities (doc. 8 at 1); in his reply to the special report he seems to indicate that he intends to sue Defendant in his individual capacity only (doc. 27 at 15). In any event, Defendant's argument that he is entitled to immunity from damages in his official capacities under the Eleventh Amendment is well taken and requires little discussion. The law is well settled that the Eleventh Amendment is an absolute bar to suit for monetary damages by an individual against a state or its agencies, or against officers or employees of the state or its agencies in their official capacities. *Kentucky v. Graham*, 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Hobbs v. E.E. Roberts*, 999 F.2d 1526, 1529–30 (11th Cir.1993). The court therefore considers Plaintiff's claims for monetary dam-

ages against Defendant in his individual capacity only.

 Fourth, general claims of retaliation are those which involve an egregious abuse of governmental power or behavior which shocks the conscience and may be brought under the due process clause of the Fourteenth Amendment; a claim that a plaintiff was penalized for the exercise of a specific constitutional right, however, is properly considered under the First Amendment. *See Thaddeus–X v. Blatter*, 175 F.3d 378, 387 (6th Cir.1999) (*en banc*) (plurality opinion) (citing the Supreme Court's disapproval in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) of some lower courts' reliance on more generalized substantive due process standards where complained-of conduct is covered by explicit provision in the Constitution). As Plaintiff in the instant case alleges that he suffered retaliation for the exercise of a specific right, i.e., the right to seek the redress of grievances, the court concludes that his claim is properly considered solely under the First Amendment. With respect to Plaintiff's medical claim, the court notes that "the Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners . . . ." *Whitley v. Albers*, 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986). Thus the court addresses Plaintiff's claim of deliberate indifference only under the Eighth Amendment.

*First Amendment Claim*

 It is well established that a prisoner's constitutional rights are violated if adverse action is taken against him in retaliation for the exercise of his First Amendment rights. *See Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir.2003); *Mitchell v. Farcass*, 112 F.3d 1483, 1490 (11th Cir.1997); *Wright v. Newsome*, 795 F.2d 964 968 (11th Cir.1986); *Adams v. James*, 784 F.2d 1077, 1080 (11th Cir. 1986). In the prison setting "[t]he state may not burden [First Amendment rights] with practices that are not reasonably related to legitimate penological objectives . . . nor act with the intent of chilling that First Amendment right." *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir.1995) (citing *Turner v. Safley*, 482 U.S. 78, 85–89, 107 S.Ct. 2254, 2260–61, 96 L.Ed.2d 64 (1987), and *Wildberger v. Bracknell*, 869 F.2d 1467, 1468 (11th Cir.1989)). In general, a prisoner may establish retaliation by "demonstrating that the prison official's actions were 'the result of his having filed a grievance concerning the conditions of his imprisonment.' " *Farrow*, 320 F.3d at 1248 (citing *Wildberger*, 869 F.2d at 1468). The prisoner must, however, come forward with more than "general attacks" upon a defendant's motivations and must produce "affirmative evidence" of retaliation from which a jury could find that plaintiff had carried his burden of proving the requisite motive. *Crawford–El v. Britton*, 523 U.S. 574, 600, 118 S.Ct. 1584, 1598, 140 L.Ed.2d 759 (1998) (citations omitted). A prisoner does not automatically cast doubt upon an institutional decision, nor is the decision "subject to exhaustive challenge," solely because he was engaged in a First Amendment right. *Adams*, 784 F.2d at 1082; *Adams v. James*, 797 F.Supp. 940, 949 (M.D.Fla.1992). Even though prison officials do not have the authority to prohibit inmates from filing grievances it does not follow that every time an inmate files a grievance the act of doing so renders the exercise of prison authority suspect. *See Adams*, 784 F.2d at 1082. Indeed, while mindful that a plaintiff may not be held to a heightened burden of proof, *see Crawford–El*, 523 U.S. at 580–86, 118 S.Ct. 1584 (holding that in retaliation claim prisoner could not be required to show "clear and

convincing" evidence of defendant's unconstitutional motives), courts should approach prisoner claims of retaliation "with skepticism and particular care" due to the "near inevitability" that prisoners will take exception with the decisions of prison officials and "the ease with which claims of retaliation may be fabricated." *Dawes v. Walker*, 239 F.3d 489, 491 (2nd Cir.2001), *impliedly overruled in part on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

The Eleventh Circuit has not yet directly established a clear standard at summary judgment for determining the validity of First Amendment retaliation claims in the prison setting. In the public employment setting, however, it has adopted a four-stage inquiry based on the Supreme Court's decisions in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), to determine whether a state actor has unlawfully retaliated against an employee because of the employee's protected speech. *See Chesser v. Sparks*, 248 F.3d 1117 (11th Cir.2001); *Stanley v. City of Dalton*, 219 F.3d 1280 (11th Cir.2000); *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir.1989).

In such cases, at the first stage the court considers as a matter of law whether the speech at issue may be fairly characterized as constituting speech on a matter of public concern. *Chesser*, 248 F.3d at

1122. If it may be, at the second stage the court applies a balancing test to determine whether as a matter of law the employee's free speech interest outweighs the interest of the state in promoting the efficiency of the public services it performs through its employees. *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. If the employee's interests outweigh those of the state, the inquiry proceeds to the third stage, which asks whether as a matter of fact "there is a 'substantial' causal link between the employee's speech and the adverse employment action." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.1996) (citing *"Bryson"* test); *see also Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1157 (11th Cir.2002) (citing *Mount Healthy*, 429 U.S. at 287, 97 S.Ct. 568). The record as a whole should be examined to determine whether a plaintiff has met his burden of showing that the protected conduct was a substantial or motivating factor in a government employment decision. *Stanley*, 219 F.3d at 1291 (citations omitted).[13] With respect to the third stage of the four-stage inquiry, "[w]here causation is lacking, an employee's claim of retaliatory discharge must fail ...." *Mize*, 93 F.3d at 742.

If the employee shows that his speech was a substantial motivating factor in the adverse decision, the court must address at the fourth stage whether the employer has shown by a preponderance of the evidence that it would have reached the same decision regardless of the protected conduct. *Id.* at 1123; *Bryson*, 888 F.2d at

---

13. In making this inquiry the court may consider such factors as whether there is a closeness in time between the protected speech and the adverse action such that retaliatory intent may be inferred; whether any comments or actions by the defendant related to the protected speech; whether the asserted reason for the adverse action changed over time; and whether there is circumstantial evidence of a causal nexus between the protect-

ed speech and the adverse action from which retaliatory intent may be inferred. *Id.* at 1291, n. 20 (citations omitted). In determining whether circumstantial evidence exists court may inquire as to who initiated any internal investigations or termination proceedings, whether there was any evidence of the decision-maker's hostility to the speech in question, or whether the defendant had a motive to retaliate. *Id.*

1566 (quoting *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568). *See also Vista Community Services v. Dean*, 107 F.3d 840, 844–45 (11th Cir.1997). "This fourth stage has been referred to as a 'but for' test; the employer must show that 'its legitimate reason, standing alone, would have induced it to make the same decision.'" *Bryson*, 888 F.2d at 1566 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989)). In other words, the question at stage four is whether the plaintiff would have suffered the adverse action "but for" his exercise of speech protected by the First Amendment. *See Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 417, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979).

 While there is a lack of clear guidance from the Eleventh Circuit with regard to First Amendment retaliation claims made by prisoners, other circuits have addressed the matter, resulting in the development of an instructive body of case law. The Second, Third, Sixth, and Seventh Circuits have expressly applied the *Mount Healthy* burden-shifting framework to retaliation claims in the prison context. *See Rauser v. Horn*, 241 F.3d 330 (3rd Cir.2001); *Thaddeus–X*, 175 F.3d at 386; *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir.1996); *Babcock v. White*, 102 F.3d 267, 275 (7th Cir.1996). Under this line of cases the plaintiff must prove: (1) that he was engaged in constitutionally protected activity; (2) that he suffered adverse action such that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) that "there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Brown v. Crowley*, 312 F.3d 782, 787 (6th Cir.2002) (citing *Thaddeus–X*); *see also Rauser*, 241 F.3d at 333–34; *Dawes*, 239 F.3d at 492–93. If the prisoner establishes that his exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct, the burden then shifts to the defendant to show that the same action would have been taken even absent the protected conduct.[14] *Brown*, 312 F.3d at 787; *Rauser*, 241 F.3d at 333–34; *Babcock*, 102 F.3d at 275. In the context of prisoner cases, in determining whether a causal connection exists the court may choose to consider such factors as the temporal proximity between the prisoner's protected activity and the defendant's adverse action, as well as statements made by the defendant regarding his motivations. *See Colon v. Coughlin*, 58 F.3d 865, 872–73 (2nd Cir.1995). A prisoner can establish retaliatory motive by alleging a chronology of events from which a retaliatory animus on the part of the defendant could reasonably be inferred. *Woods*, 60 F.3d at 1166 (citing *Cain v. Lane*, 857 F.2d 1139, 1143 n. 6 (7th Cir. 1988)).

---

**14.** In applying the *Mount Healthy* burden-shifting framework courts should incorporate the deferential balancing test articulated in *Turner v. Safley*, 482 U.S. at 89, 107 S.Ct. 2254 (holding that official conduct that impinges on the constitutional rights of an inmate is valid if it is "reasonably related to legitimate penological interests"). *See Rauser*, 241 F.3d at 334; *see also Hewitt v. Helms*, 459 U.S. 460, 472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (stating that prison officials are allowed wide discretion to provide for the security, safety, and orderly operation of prison facilities), *modified on other grounds, Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). "This means that, once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334.

Other circuits have also recognized *Mount Healthy* in reviewing retaliation claims by prisoners but without adopting its burden-shifting framework. *See Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir.1998) (requiring prisoner to come forward with direct or circumstantial evidence that "but for the retaliatory motive, the incidents to which he refers ... would not have taken place"); *Goff v. Burton*, 7 F.3d 734, 737 (8th Cir.1993) (acknowledging *Mount Healthy* but stating that in retaliatory transfer case prisoner must prove "but for" the retaliatory motive the allegedly unconstitutional conduct would not have occurred); *cf. Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir.1995) (citing *Mount Healthy* but indicating that burden remains on prisoner to show that "but for" the retaliatory motive the complained of incident would not have occurred); *McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir. 1979) (same).[15]

 This court is not aware of any case to date in which the Eleventh Circuit has expressly applied the *Pickering*/Mount Healthy analysis in the context of a prisoner First Amendment retaliation claim. As noted above, however, in the employment setting the Eleventh Circuit has long employed this analysis. *See Bryson, supra; see also Chesser* and *Stanley, supra.* In addition, as previously discussed, numerous circuit courts of appeals have found prisoner and employment retaliation claims sufficiently analogous to adopt or acknowledge the standard in prisoner cases, either with or without the burden-shifting framework.[16] *See Rauser, Thaddeus–X, Graham*, and *Babcock, supra* (applying the *Mount Healthy* burden-shifting analysis), and *Peterson, Goff, Woods*, and *McDonald, supra* (referencing *Mount Healthy* but not applying the burden-shifting analysis); *see also Adams v. Wainwright*, 875 F.2d at 1537 (declining to adopt "but for" standard in prisoner First Amendment retaliation case which would place greater burden of proof on inmate). Accordingly, the court concludes that in this circuit it is appropriate to apply the *Mount Healthy* burden-shifting framework to First Amendment claims of retaliation brought by prisoners and shall do so in this case.

 As Defendant asserts his entitlement to qualified immunity, the court first addresses the question of whether Plaintiff's allegations regarding Defendant's conduct, if true, establish the violation of a constitutional right. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. To make this showing and survive summary judgment, Plaintiff must demonstrate from the evidence that a genuine issue of material fact exists on the questions whether he was

---

**15.** In *Adams v. Wainwright*, 875 F.2d 1536, 1537 (11th Cir.1989) (per curiam), a First Amendment retaliation case in the prisoner context, the Government urged the Eleventh Circuit to adopt the "but for" standard set forth by the First Circuit in *McDonald*, in which the burden remains on the prisoner/plaintiff rather than shifting to the defendant. Without discussion the court declined to do so, "to the extent that the 'but for' test places a greater burden of proof on the inmate." *Adams*, 875 F.2d at 1537 (citing *Hall v. Evans*, 842 F.2d 337 (11th Cir.1988) (table decision vacating district court order granting summary judgment to Defendants based on "but for" analysis)).

**16.** It is also worth noting that the elements of a prima facie case in retaliation claims brought by prisoners under the First Amendment in the Second, Third, and Sixth Circuits, as set out above, are quite similar to those set forth by the Eleventh Circuit in the context of retaliation claims brought under 42 U.S.C. § 2000e–3(a). The Eleventh Circuit has explained that in such cases the plaintiff must show (1) that he was engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) that there is a causal connection between the two events. *Brochu*, 304 F.3d at 1155.

engaged in constitutionally protected activity; whether he suffered adverse action; and whether his exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. 568; *Stanley,* 219 F.3d at 1290; *Rauser,* 241 F.3d at 333–34; *Thaddeus-X,* 175 F.3d at 386; *Dawes,* 239 F.3d at 492–93. In this case, Defendant does not dispute that Plaintiff engaged in protected activity by filing his grievance or that Plaintiff's transfer to field force duty as a consequence, if true, would constitute an adverse action. In any event, the court shall assume that Plaintiff has met his burden with respect to demonstrating that filing his January 9 grievance challenging the denial of the BBS pass was a constitutionally protected activity.[17] The court shall likewise assume that Plaintiff has shown that, in being cleared for arduous field force duty after having been assigned to a less demanding welding job, he suffered an adverse action.

 The court concludes, however, that Plaintiff has failed to demonstrate on this record the existence of a genuine material fact as to whether his filing the grievance was a substantial or motivating factor in Defendant's decision to transfer him to field force duty. *Stanley,* 219 F.3d at 1291. As noted, a prisoner can establish retaliatory motive by alleging a chronology of events from which the defendant's retaliatory animus could reasonably be inferred. *Woods,* 60 F.3d at 1166. Plaintiff in this case has presented the following chronology of events relative to

his retaliation claim: that as of July 1999 Plaintiff was assigned to duty as a welding aide with a work restriction limiting him to standing no longer than fifteen minutes; that Plaintiff filed a grievance on January 9 complaining about Defendant's refusal on January 8 to issue him a pass for bashful bladder syndrome; that on January 22 Defendant asked him during a CIC appointment whether he planned to continue to pursue his grievance and acted "short" and "serious"[18] with him when Plaintiff indicated that he would so continue; that Defendant canceled his "no standing" pass and medically approved him for field force work some time between January 22 and January 24; that on January 25 the classification committee changed Plaintiff's job assignment to the field force squad based upon Defendant's medical approval; that after working on the field force squad from January 30 through February 2 Plaintiff suffered severe abdominal pain which resulted in his undergoing numerous medical tests and being housed in the infirmary for approximately one week; and that after his discharge from the infirmary Plaintiff was reissued his prior medical passes which prescribed no prolonged standing and no lifting or pulling over twenty pounds and reassigned to a welding job.

Contrary to Plaintiff's assertion, the record evidence shows that Plaintiff's appointment with Defendant, at which he contends Defendant was "short" with Plaintiff upon being advised that Plaintiff intended to pursue his grievance, did not take place on January 22. Rather, the appointment occurred on January 23, one day *after* Defendant had already cleared Plaintiff for

---

**17.** An inmate has a First Amendment right to file grievances against prison officials, but only if the grievances are not frivolous. *See Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("Depriving someone of a frivolous claim ... deprives him of nothing ....."). While Defendant has described Plaintiff's January 9 grievance regarding the

denial of a bashful bladder pass as frivolous because prison regulations did not allow for such a pass, the court shall accept that Plaintiff's challenge of the denial was not frivolous.

**18.** In his reply Plaintiff also describes Defendant's reaction as "aggressive." (Doc. 27 at 7).

duty on the field force squad.[19] (Doc. 24, Exhs. L and M). Thus on the record it appears that no causal connection exists between Plaintiff's advising Defendant on January 23 that he intended to continue to pursue his grievance and Defendant's making his decision to clear Plaintiff for field force duty on January 22. Nevertheless, the temporal proximity between Plaintiff's filing his grievance on January 9 and Defendant's making his decision does provide some circumstantial support for a causal connection. *See Stanley,* 219 F.3d at 1291; *Thaddeus–X,* 175 F.3d at 399 (circumstantial evidence, such as the timing of events, may be evidence of motivation). This evidence alone, however, is not sufficient to meet Plaintiff's burden of showing that the filing of his grievance was a substantial or motivating factor in Defendant's conduct. *See Mize,* 93 F.3d at 745. "It does not follow [ ] that every time a person engages in constitutionally protected activity within a short time prior to an [adverse action] that an inference may reasonably be drawn that they were related." *Id.; see Adams,* 784 F.2d at 1082 (noting that an inmate's filing a grievance does not consequently render the exercise of prison authority suspect). In the instant case, the temporal connection between Plaintiff's filing his grievance on January 9 and Defendant's making his decision on January 22 is the sole evidence of record to which Plaintiff can point in support of his claim of retaliatory animus.[20] Such evidence simply is insufficient to permit a reasonable inference that Defendant's action was motivated by a desire to retaliate. *See Mize,* 93 F.3d at 745. There is absolutely no evidence that Defendant had any rea-

son to retaliate against Plaintiff. In fact, the evidence suggests that the professional relationship between Plaintiff and Defendant prior to January 8 was fairly good. Plaintiff notes in his affidavit that Defendant "had always conducted himself in a professional manner until this malicious act." (Doc. 27 at 21). Moreover, Plaintiff does not dispute Defendant's statement in his affidavit that

> Prior to denying Inmate Pate's request for a bashful bladder pass we had enjoyed a very workable patient/provider relationship. Inmate Pate had openly commented on his confidence in my abilities, knowledge, and judgment. Additionally, Inmate Pate had requested permission to remain as part of my patient caseload rather than being seen by the institutional physician.

(Doc. 24, Exh. Y).

In addition, Plaintiff does not challenge Defendant's assertion that under DOC policy and regulations [21] Defendant had no authority to grant Plaintiff the requested pass. (Doc. 24, Exh. Y). Moreover, Plaintiff does not dispute, and in fact his medical records support, Defendant's statement that in accordance with DOC policy he noted that Plaintiff had "voiced a concern [with] his inability to void in public." (Doc. 24, Exhs.K, Y). In addition, on January 16, which was prior to Defendant's January 22 decision to clear Plaintiff for field work, the SHSA supported Defendant's action by noting in the medical record that the grievance was denied as invalid because there were procedures in place to handle such situations. (*Id.,* Exh. L). On January 19 Dr. Huynh also approved and explained the denial of the BBS pass

---

**19.** Plaintiff was seen routinely in the CIC on January 23, when he reported no complaints and "no HIV-related issues since last clinic." (Doc. 24, Exh. M).

**20.** Events in the chronology occurring subsequent to January 22 have no relevance to

Defendant's state of mind on or before that date.

**21.** *See* Fla. Admin Code 33–108.101(3)(c) (formerly 33–602.2045) (setting forth procedure for urine specimen collection from inmates alleging inability to urinate).

in his written response to Plaintiff's grievance. (*Id.*, Exh. A).

Plaintiff has produced no "affirmative evidence" that Defendant was motivated to retaliate against him on January 22 simply because on January 9 Plaintiff filed a grievance complaining of Defendant's refusal to issue a BBS pass. *See Crawford–El*, 523 U.S. at 600, 118 S.Ct. 1584. Defendant's denial of a BBS pass was required by DOC policy and had already been approved by two of his superiors at the time of his decision to clear Plaintiff for unrestricted duty. Defendant had no reason to expect any adverse consequences to him as a result of Plaintiff's grieving the denial of the BBS pass, and Plaintiff has offered nothing which supports a finding of other retaliatory motive. The court concludes that Plaintiff has failed to present evidence which supports a reasonable inference of retaliatory animus. Plaintiff's bare allegation of malice on the part of Defendant is not enough to raise a genuine issue of material fact on the issue of causation. *Id.* at 588, 118 S.Ct. 1584; *see also Thaddeus–X*, 175 F.3d at 399.

■ Notwithstanding, even assuming that Defendant's decision was influenced in substantial part by Plaintiff's grievance and thus that a causal connection has been demonstrated, the court concludes that Defendant has met his burden of showing he would have taken the same action regardless whether Plaintiff had filed a grievance. Defendant states that he based his decision to clear Plaintiff for field work on Plaintiff's physical appearance, which was very muscular from weight lifting; his professional opinion that the nature of Plaintiff's conditions did not automatically preclude Plaintiff from performing physical labor; and Plaintiff's medical records which indicated that Plaintiff's conditions were stable at that time. Dr. Huynh's statement that although Plaintiff had an "extensive and complex past health history, [his] current status has actually been quite good" (doc. 24, exh. C) lends support to Defendant's contentions. Dr. Huynh also noted in Plaintiff's medical records on February 5 that Plaintiff was in "general good physical condition (looks healthy and athletic)." (*Id.*, Exh. P). On February 19, which was about one week after Plaintiff was released from the infirmary, Dr. Huynh made a similar comment, noting that Plaintiff was "healthy looking in appearance, muscular [inmate with] good looking complexion (re [no] cyanosis)." (*Id.*, Exh. U). Dr. Huynh also noted on February 19 that "6 months after completing Interferon liver damage has been done but liver [ ] so far are not bad, evidence[d] by [normal] albumin, total bilirubin. HIV(+) responding great to [medication]." (*Id.*). Plaintiff's medical records dated November 1 and November 28 reflect unremarkable physical examinations and no recent sick call visits; on November 28 he reported "feel[ing] good." (*Id.*, Exh. H). Although Plaintiff had failed Interferon therapy for his Hepatitis C condition his HIV "labs" were "stable." [22] (*Id.*, Exhs. G and H). Moreover,

---

**22.** While the court is not qualified to evaluate Plaintiff's laboratory results, it notes the test results from reports dated October 27, 2000, and January 12, 2001, which Plaintiff has supplied. (Doc. 27 at 57–60). In the October report Plaintiff's CD4 result was 549 and in January it was 395, as compared to a reference range of 359–1519. Thus, as Plaintiff alleges Defendant advised him at his January 22 CIC appointment, Plaintiff's CD4 test results apparently reflected a decline; the results indicate that they were still within the normal range, however.

In the October report Plaintiff's liver profile tests, the AST (SGOT) and the ALT (SGPT), in October were 34 (reference range 0–45) and 59 (reference range 0–50), respectively. The January report indicates elevated results, with the AST at 64 and the ALT and 69. Both reports note HIV viral loads of less than 50

Plaintiff's own statements or actions seem to confirm that prior to his placement on the field force squad his health status had been good. For example, in his February 8 grievance Plaintiff stated that his health was "much improved" as of January 25 and in his February 20 grievance he noted that he had been "very active" the previous twenty months. (Doc. 24, Exhs. C and D). Further, an entry in Plaintiff's medical records dated December 19, 2000, reflects that he requested soft shoes to permit him to exercise more comfortably, yet another indication that he seemed to be feeling well not long before Defendant's decision to clear him for field work. (Id., Exh. I). The court therefore concludes that Defendant has adequately met his burden of showing that he would have made the same decision to clear Plaintiff for the field force squad absent Plaintiff's protected conduct of filing a grievance.[23]

In summary, the court concludes that the record contains no evidence with respect to Plaintiff's January 9 grievance and Defendant's January 22 decision from which a causal connection between them could reasonably be inferred. Notwithstanding, even if the evidence presented a question of fact as to causation, the court concludes that the record shows that the Defendant would have made the same decision had Plaintiff not filed the grievance. Accordingly, because there is no evidence from which a jury could reasonably conclude that Defendant violated Plaintiff's First Amendment rights, Defendant is entitled to qualified immunity and summary judgment in his favor on his retaliation claim.

*Eighth Amendment Claim*

▇▇▇▇ Medical claims under the Eighth Amendment have an objective and subjective component, each of which additionally is considered to encompass two subsidiary requirements. *Taylor v. Adams,* 221 F.3d 1254, 1258 (11th Cir. 2000), *cert. denied,* 531 U.S. 1077, 121 S.Ct. 774, 148 L.Ed.2d 673 (2001). The "objective component" of the Eighth Amendment standard requires a determination whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. *See Wilson v. Seiter,* 501 U.S. 294, 303, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991). This objective component varies with the situation and the conduct in question and is responsive to "contemporary standards of decency." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); *see also Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). An objectively serious deprivation requires (1) showing an objectively "serious medical need." *Estelle,* 429 U.S. at 104, 97 S.Ct. 285. A serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). In addition, an objectively serious deprivation requires (2) showing the response made by the defendant to that need was so deficient as to constitute "an unnecessary and wanton infliction of pain" and not simply "negligen[ce] in diagnosi[s] or treat[ment]," or even "[m]edical malpractice" actionable under state law. *Estelle,* 429 U.S. at 105–06, 97 S.Ct. 285 (internal quotation marks omitted). *See Taylor,* 221 F.3d at 1257;

---

copies per milliliter, which the report appears to indicate is acceptable.

**23.** Defendant's reasons for approving Plaintiff to work on the field force squad are supported by a preponderance of the evidence. Moreover, in light of the deference that is due

a prison official's decision, the court concludes that Defendant's reasons may be said to be reasonably related to a legitimate penological interest in orderly prison administration. *Rauser,* 241 F.3d at 334.

*see also Farrow,* 320 F.3d at 1243. To show the required subjective intent to punish the plaintiff must demonstrate that the defendant acted with an attitude of "deliberate indifference." *Estelle,* 429 U.S. at 105, 97 S.Ct. 285. This is defined as requiring (1) an "aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists" and (2) the actual "draw[ing of] the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. In sum, in a claim of denial of medical attention under the Eighth Amendment "[u]ltimately, there are [ ] four requirements: an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." *Taylor,* 221 F.3d at 1258.

 The record evidence in this case shows that after being assigned to the field force squad and working at hard labor for four days Plaintiff experienced severe abdominal pain which resulted in his being sent to the hospital twice for tests and being hospitalized in the prison infirmary for approximately one week. Plaintiff's medical records for the months immediately following also appear to reflect significantly elevated liver profile results in laboratory reports dated February 4 (doc. exh. AA); February 13 (doc. 27 at 55); February 20 (*id.* at 54); March 7 (*id.* at 52); March 14 (*id.* at 49).[24] While this record certainly reflects Plaintiff's serious medical needs and attendant problems it is not sufficient to demonstrate that Defendant's response to those needs was objectively insufficient and subjected Plaintiff to the "unnecessary and wanton infliction of pain" within the meaning of the Eighth

Amendment. *Estelle,* 429 U.S. at 105–06, 97 S.Ct. 285. The record supports Defendant's assertion that his tentatively clearing Plaintiff for field work was a medical judgment. That in hindsight this judgment may have been poor or even that it may have constituted negligence or medical malpractice does not elevate Plaintiff's claim to a tort of constitutional dimensions. *See Estelle,* 429 U.S. at 105–06, 97 S.Ct. 285; *see also Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (stating that negligence alone is not enough to violate the Constitution); *Harris v. Thigpen,* 941 F.2d 1495, 1505 (11th Cir.1991) (indicating that a difference of opinion over matters of medical judgment does not give rise to a constitutional claim). Accordingly, Plaintiff has failed to satisfy the objective prong required in Eighth Amendment medical claims.

 Even assuming, *arguendo,* that Plaintiff had satisfied the objective prong of the standard, the court concludes that he has failed to demonstrate that Defendant acted with an attitude of "deliberate indifference." *Estelle,* 429 U.S. at 105, 97 S.Ct. 285. In claiming that his assigned work exceeded his physical capacity in violation of the Eighth Amendment Plaintiff must show that Defendant knowingly permitted Plaintiff to be compelled to perform physical labor that was beyond his strength, dangerous to his health, or unduly painful. *Mays v. Rhodes,* 255 F.3d 644, 649 (8th Cir.2001). Plaintiff has not made this showing. Defendant's assessment that Plaintiff was muscular and healthy-looking in physical appearance, that his conditions did not inherently prevent him from being physically active, and that his

---

**24.** Again, as the court is not qualified to evaluate Plaintiff's laboratory results it makes no attempt to do so. It merely notes that, as compared with the liver profile test results from October 2000 and January 2001, these later reports appear to reflect significant elevation, with abnormally high AST (SGOT) results ranging from 95 to 143 and ALT (SGPT) results ranging from 130 to 304.

medical records indicated his conditions were stable at the time of Defendant's decision is supported by the record. Moreover, Defendant specified that his approval was "tentative" and would be re-evaluated as necessary. As Defendant notes, Plaintiff could have requested such a re-evaluation, sought medical attention, or even filed a grievance regarding his transfer to the field force squad some time prior to February 2 if he felt unable to perform the work assigned to him; it was not until February 2, however, that Plaintiff complained of medical problems and not until February 8 that he filed a grievance regarding this matter. In short, Plaintiff has not come forward with evidence showing that Defendant subjectively knew of facts from which the inference could be drawn that approving Plaintiff for work on the field force squad presented a substantial risk of serious harm to Plaintiff and that in fact Defendant actually drew such an inference. *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970; *Taylor*, 221 F.3d at 1258.

Plaintiff has failed to present evidence from which a jury could reasonably conclude that Defendant violated his rights under the Eighth Amendment by approving him for field force duty on January 22, 2001. Accordingly, Defendant is entitled to qualified immunity and summary judgment in his favor on Plaintiff's claim of deliberate indifference to his serious medical needs.

It is therefore ORDERED:

1. Plaintiff's request to stay this matter is DENIED.

2. Plaintiff's "Motion for Judicial Notice" (doc. 51) is DENIED.

3. Defendant's special report (doc. 24), treated as a motion for summary judg-

ment, is GRANTED. The clerk shall enter judgment accordingly.