**Mark OSTERBACK, Plaintiff,**

v.

**Doyle KEMP, et al., Defendants.**

**No. 4:01CV207–RH/WCS.**

United States District Court,
N.D. Florida,
Tallahassee Division.

Oct. 15, 2003.

---

1. See doc. nos. 27 and 41.

Donna Marie Laplante, Attorney General State of FL—Tallahassee FL, State of Florida, Tallahassee, for Doyle W Kemp.

## ORDER GRANTING SUMMARY JUDGMENT IN PART

SHERRILL, United States Magistrate Judge.

Plaintiff is an inmate in the Florida Department of Corrections. While at Walton Correctional Institution, he filed grievances and challenged actions of correctional authorities in various respects, often successfully. He was transferred to nearby Santa Rosa Correctional Institution on February 1, 2000. Plaintiff complained of actions of the Santa Rosa librarian, Defendant Barry Zane Rhodes, and filed a grievance against Mr. Rhodes with the Florida Bar, which was promptly dismissed as unfounded. Soon after the dismissal, in September 2000, Mr. Rhodes recommended Plaintiff's transfer to another institution, explicitly based on the filing of the Bar grievance. Plaintiff was transferred to Hamilton Correctional Institution.

By his complaint in this action, Plaintiff asserts that each of these transfers was made in retaliation for his exercise of First Amendment rights. He seeks damages and injunctive relief against a number of correctional officials.

Defendants have moved for summary judgment. The Magistrate Judge has entered a Report and Recommendation, which thoroughly documents the authorities in this area. No purpose would be served by reiterating that discussion in this order. Instead, this order announces the court's decision, which accepts the Magistrate Judge's recommendation in part, and summarizes the basis for the ruling.

The Magistrate Judge has recommended that the motion for summary judgment be granted with respect to the first transfer and denied with respect to the second. I accept the recommendation and grant Defendants' motion for summary judgment with respect to the first transfer, disagree with the recommendation and thus grant the motion for summary judgment with respect to the damages claim arising from the second transfer, and accept the recommendation and thus deny the motion for summary judgment with respect to the claim for injunctive relief arising from the second transfer.

A summary of the grounds for this ruling is as follows. The authorities supporting the ruling are well set forth in the Report and Recommendation.

First, Plaintiff's various complaints and grievances constituted speech and petitions to the government protected by the First Amendment, as Defendants apparently acknowledge.

Second, at least for purposes of the pending summary judgment motion, Plaintiff has adequately supported the assertion that the transfers were made as a result of Plaintiff's complaints and grievances.

■ Third, in light of the deference properly afforded the decisions of prison authorities on matters of safety and proper administration of facilities, the transfer of Plaintiff from Walton to Santa Rosa was not unconstitutional. This is so because the transfer was "reasonably related to legitimate penological interests" separate and apart from any purpose to retaliate. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (applying standard to prisoners' religion claim), quoting Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (applying standard to prisoners' free speech and association claims). Any adverse effect on Plaintiff was not sufficient to preclude a transfer based on those legitimate penological interests.

■ Fourth, whether the same is true with respect to the transfer from Santa Rosa to Hamilton cannot be determined as a matter of law based on this record; this is, instead, a triable issue.

■ Fifth, the law on this issue—transfer of a prisoner in response to an unfounded Bar grievance against a librarian with whom the prisoner has contact on a daily basis—was not sufficiently clearly established at the time of this transfer to overcome the defense of qualified immunity.[1] Defendants thus are entitled to summary judgment on Plaintiff's claim for damages based on this transfer.

In light of these rulings, this matter will be remanded to the Magistrate Judge for appropriate further proceedings. In light of the dismissal of all damages claims, the Magistrate Judge may reconsider as and when appropriate the issue of the number and identity of proper defendants.

For these reasons,

IT IS ORDERED:

Defendants' motion for summary judgment (documents 82 and 85) is GRANTED IN PART and DENIED IN PART. Summary judgment is granted with respect to all claims arising from Plaintiff's transfer from Walton Correctional Institution to Santa Rosa Correctional Institution and with respect to all claims for damages arising from Plaintiff's transfer from Santa Rosa Correctional Institution to Hamilton Correctional Institution. Summary judgment is granted with respect to all claims against any Defendant in his or her individual capacity. Summary judgment is denied with respect to claims against Defendants in their official capacities for injunctive relief arising from Plaintiff's transfer from Santa Rosa Correctional Institution to Hamilton Correctional Institution. I do *not* direct the entry of judgment under Federal Rule of Civil Procedure 54(b). This matter is remanded to the Magistrate Judge for such further proceedings as may be appropriate.

## REPORT AND RECOMMENDATION

SHERRILL, United States Magistrate Judge.

Plaintiff, a *pro se* inmate filed a second amended civil rights complaint under 42 U.S.C. § 1983, doc. 75, alleging that he was transferred twice from one prison to another in retaliation for filing grievances and lawsuits, and engaging in protected

---

1. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); *see generally Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In qualified immunity cases, a critical issue is the level of generality at which the applicable law is assessed. Here, it does not matter that the prison official at issue was the librarian, rather than some other official. It does not matter that the grievance that led to the action was filed with the Florida Bar, rather than some other outside agency; it may not even matter that the grievance was filed with an outside agency, rather than within the Department of Corrections itself. Still, not all transfers brought about as a result of protected activity are unlawful, as confirmed by the ruling in the case at bar with respect to the first transfer. At some point, friction between inmate and staff, even if caused by the inmate's protected activity, warrants a transfer to a sufficiently comparable facility, in the interest of safety and proper prison maintenance. The defense of qualified immunity is overcome only when it is clear at the time of the proposed transfer that the line has been crossed—that a transfer under these circumstances would be unconstitutional. *Cf. Martin v. Baugh*, 141 F.3d 1417, 1420 (11th Cir. 1998) (upholding qualified immunity defense to public employee's First Amendment claim and noting that the law applicable to such claims makes it rare for the result to be sufficiently clear to overcome qualified immunity defense). The authorities in place at the time of the transfer in the case at bar did not make it clear that the second transfer, even on Plaintiff's version of the facts, would be unconstitutional.

First Amendment activities. The first is Plaintiff's transfer from Walton Correctional Institution to Santa Rosa Correctional Institution on February 1, 2000. The second is Plaintiff's transfer from Santa Rosa Correctional Institution to Hamilton Correctional Institution in November of 2000.[1]

Defendants filed a special report, doc. 82, supplemented by a separate memorandum of law. Doc. 85. Defendants also filed a notice of supplemental authority. Doc. 92. The special report was construed as a motion for summary judgment and Plaintiff was advised of his obligation to respond in accordance with Rule 56. Doc. 83. Plaintiff was permitted to conduct limited discovery prior to responding to the summary judgment motion. Docs. 88, 90, 98, and 103. Plaintiff has filed a response to the motion, doc. 109, with exhibits in support of his claims.

Defendants had earlier filed a motion to dismiss, doc. 57, Plaintiff's amended complaint, doc. 55. The motion was granted in part and denied in part, and Plaintiff was directed to file the second amended complaint. Doc. 67.

## I. Legal standards governing a motion for summary judgment

On a motion for summary judgment Defendants initially have the burden to demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corporation v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If they do so, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, *Matsushita Electric Industrial Co., Ltd. v. Ze-*

*nith Radio Corporation*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and a "scintilla" of evidence is insufficient. There must be such evidence that a jury could reasonably return a verdict for the party bearing the burden of proof. *Anderson v. Liberty Lobby*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). All reasonable inferences must be resolved in the light most favorable to the nonmoving party. *Watkins v. Ford Motor Co.*, 190 F.3d 1213, 1216 (11th Cir.1999).

"Rule 56(e) ... requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir.1997), *cert. denied* 522 U.S. 1126, 118 S.Ct. 1074, 140 L.Ed.2d 133 (1998), *quoting Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c), (e)). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). *Owen v. Wille*, 117 F.3d at 1236; *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

## II. The relevant Rule 56(e) evidence

### a. Defendants' evidence, doc. 82

On January 3, 2000, while Plaintiff was housed at Walton Correctional Institution, Defendant Mary Scott prepared a progress report for Plaintiff. Doc. 82, p. 6. Defendant Scott was Plaintiff's probation officer. *Id.* The progress report stated that Plaintiff's work assignment as a houseman was "unsatisfactory," as was Plaintiff's "quarters adjustment." Doc. 82,

---

1. Plaintiff has omitted a third claim because the transfer to Jackson Correctional Institution was only an intermediate stop in the transfer to Hamilton Correctional Institution. Doc. 109, p. 4.

p. 6; exhibits A1–A2. Defendant Scott recommended that Plaintiff be transferred to Santa Rosa Correctional Institution for a "program change." Ex. A–2. The specific reason given for that recommendation was the fact that although Plaintiff had been at Walton Correctional Institution only since July 14, 1999, he had been issued several disciplinary reports which had "not been fully processed for various reasons." *Id.* Defendant Scott stated that some disciplinary reports had "been disapproved prior to delivery," were "returned by the team for technical errors," and two disciplinary reports were "overturned by Central Office." *Id.* Because only three disciplinary reports had "been fully processed," the "Administration" felt it had "lost credibility with" Plaintiff and it would be in the best interest of maintaining security and order at the institution, as well as for Plaintiff, that he be transferred. *Id.*

The progress report prepared by Defendant Scott also contains the signature of Defendant Porter, listed as Classification Supervisor, and approved by the Warden, Defendant Rabion. *Id.* A transfer recommendation worksheet was completed on January 7, 2000.[2] Doc. 82, ex. A3. The stated transfer reason is for a "program change" which means that "[c]ontinued placement at current location [is] not in [the] best interest of facility or inmate." *Id.* Plaintiff was transferred to Santa Rosa Correctional Institution on February 1, 2000. Doc. 82, p. 7.

While at Santa Rosa, on September 23, 2000, Defendant Rhodes wrote a memorandum to the assistant Warden at Santa Rosa, Defendant Farley, recommending that Plaintiff be transferred. Defendant Rhodes was, at the time, a librarian at Santa Rosa, and he complained in the memo that Plaintiff had filed a complaint against him with the Florida Bar. Doc. 82, p. 7. The complaint was ultimately "dis-

missed as unfounded" and expunged after one year. *Id.* Defendant Rhodes's memorandum asserted that Plaintiff had raised allegations against him, having nothing to do with his job, and stated that those "unfounded, frivolous allegations" affected him "outside the scope of" his employment with the Department. Doc. 82, ex. B–1. Defendant Rhodes further stated that Plaintiff's actions caused him "to devote a considerable amount of [his] own personal time [in] addressing those false allegations" and created undue stress. *Id.* Defendant Rhodes explained further:

> [Plaintiff's] actions are obviously calculated to intimidate me into a compromising position in the performance of my duties. I feel that he is attempting to extort me into ignoring department rules to his advantage or perhaps he thinks he can force me into some inappropriate action in my dealing with him.
>
> In any event, Osterback's actions have created an atmosphere of tension and I believe step over the bounds of propriety on his part. He is a perpetual visitor to the law library and I am compeled [sic] to deal with him several times each day. Therefore, I ask that he be transferred to another institution.

Doc. 82, ex. B–1. A progress report for Plaintiff has been provided and indicates that Plaintiff was rated as "satisfactory" at his assigned job in food service and had a "satisfactory" rating for "quarters adjustment." *Id.*, at B–2.

On October 2, 2000, a transfer recommendation was made from Defendant Beasly, Plaintiff's correctional probation officer at Santa Rosa C.I., to send Plaintiff to Hamilton Annex. Doc. 82, p. 8; ex. B–3. In making the "special review" transfer recommendation, Defendant Beasly essentially reiterated the memorandum issued

---

**2.** The date of Defendant Scott's signature is January 11th. Doc. 82, ex. A4.

by Defendant Rhodes. *Id.*, at 8. She stated:

> Inmate Osterback has created a very hostile environment in the library. Inmate Osterback has taken actions against Mr. Rhodes that has affected him outside the scope of his employment with the dept. Inmate Osterback has pried into Mr. Rhodes personal life and made inquiries and unfounded frivolous allegations against Mr. Rhodes with another regulating agency that has nothing to do with Mr. Rhodes' job. Inmate Osterback is a perpetual visitor to the law library and [Mr. Rhodes] is compelled to deal with him several times each day.

Doc. 82, ex. B–3. Those comments are followed by a notation to see the attached memo from Mr. Rhodes. *Id.* Finally, Defendant Beasly stated, "It is in the best interest of SARCI[3] and the library to move this inmate due to the inappropriate action on Inmate Osterback's part." *Id.* The report is then signed and the recommendation approved by the following persons: Defendant Sloan, the Classification Supervisor at SARCI; Defendant Farley, the Assistant Warden (who is also identified on the recommendation as "ICT Chairman"); and Defendant Workman, from Central Office. Doc. 82, p. 8; ex. B–3. A transfer recommendation worksheet was completed on October 2, 2000, and stated that Plaintiff was being recommended for a special review transfer. Doc. 82, ex. B–4. The recommendation was to send Plaintiff to Hamilton C.I. Annex or, in the alternative, to Baker Correctional Institution. *Id.* The signature on that worksheet is Defendant Beasly, the Correctional Probation Officer. *Id.*, at B–5.

On November 1, 2000, Plaintiff was transferred from Santa Rosa Correctional Institution to Jackson Correctional Institution. Doc. 82, p. 9. He was then sent to Hamilton Correctional Institution on November 16, 200. *Id.* When Plaintiff left Santa Rosa Correctional Institution he was in general population, and Plaintiff remained in general population upon arrival at Hamilton C.I. *Id.; see also* doc. 82, exhibits C1–C2.[4]

### b. Plaintiff's evidence

Plaintiff has provided an affidavit in which he states that after he arrived at Walton Correctional Institution, an "outgoing letter" was returned to him because his letter "did not contain [Plaintiff's] dorm and bunk number in the return address." Doc. 109, ex. A, ¶ 3. Plaintiff filed a grievance concerning the matter. *Id.* Plaintiff then averred in his affidavit that he had an encounter with a mailroom employee who became "irate" with Plaintiff and told him that "she didn't like people who tried to be smarter than staff by questioning their decisions." Doc. 109, ex. A, ¶ 4. Within a week, Plaintiff was issued three disciplinary reports "based on the content of" outgoing letters written by Plaintiff. Doc. 109, ex. A, ¶ 5. Plaintiff argued to the investigating officer that the disciplinary reports were improper. *Id.*, at ¶¶ 6–10. Plaintiff also raised his arguments with Defendant Scott and the other disciplinary team members that the disciplinary report was unconstitutional, but Plaintiff was found guilty and given 30 days in confinement with 60 days gain time forfeiture.

---

**3.** SARCI stands for Santa Rosa Correctional Institution.

**4.** Defendants have provided an "internal movements" sheet which lists Plaintiff's movement history with the Department of Corrections. Doc. 82, exhibits C1–C2. Defendants' explanation in the summary judgment motion is accepted as the exhibits contain codes which are unknown.

*Id.,* at ¶ 11. This disciplinary report was overturned by Central Office and expunged. *Id.,* at ¶ 17.

A second disciplinary report (conspiring to have someone mail him blank paper with writing on it) was dismissed during the disciplinary hearing stage. Doc. 109, ex. A, ¶¶ 12, 13. Plaintiff learned several weeks later that it was dismissed because "the statement of facts failed to allege any violation of departmental rules." *Id.,* at ¶ 14.

The third disciplinary report was written by correctional officer Mooney and charged Plaintiff with attempting to use legal mail to send a letter that did not qualify as legal mail. Doc. 109, ex. A, ¶ 18. The disciplinary report was never processed because, apparently, Plaintiff was able to sufficiently demonstrate to the investigator that the address was correct (the same address from which he had received legal mail) and the letter constituted legal mail. *Id.,* at ¶ 19.

A fourth disciplinary report was issued to Plaintiff for possession of contraband. Doc. 109, ex. A, ¶¶ 20–21. Plaintiff claimed, however, that he erroneously received too many stamps through the mail (over 20 stamps at one time are deemed contraband by institutional rules). *Id.,* ¶ 20. The stamps came in three letters mailed at different dates but arriving on the same date. *Id.* Petitioner filed an informal grievance concerning the problem. *Id.,* at ¶ 22. "Because of this grievance and the mailroom's malfeasance it exposed, the DR was written but [Plaintiff] was never served a copy." *Id.*

Plaintiff submitted copies of the disciplinary reports and the disciplinary team's findings of guilty as exhibit C. Doc. 109, ex. C. Plaintiff also provided copies of two of his formal grievances concerning the disciplinary reports, which show that the reports were overturned by Central Office. *Id.* Plaintiff also submitted disciplinary reports that apparently were investigated and not processed. Doc. 109, ex. D. A copy of an inmate request also reveals that when Plaintiff complained to Defendant Scott about why he was given the "DR for 1–4 based on statements to a relative or friend in a letter," the response told Plaintiff that she was "advised to process the DR which was subsequently dismissed." Doc. 109, ex. I.

Plaintiff explains various circumstances which lead him to believe that officials at Walton Correctional Institution were aware of his various litigation efforts and grievances. Doc. 109, ex. A, ¶¶ 23–33.[5] Plaintiff related one incident in which an officer told him, "You think you're special because you won a case in federal court, don't you?" *Id.,* at ¶ 31. Plaintiff also expressed his belief that correctional staff "did not like anyone who challenged their authority" and made efforts to punish him for using the grievance procedure. *Id.,* at ¶ 34.

In support of his assertion that correctional officers were aware of Plaintiff's grievances, Plaintiff filed a copy of an administrative grievance sent to the Secretary's Office in which he grieved the destruction of property caused by a delay in receiving the property inventory sheet. Doc. 109, ex. E. Plaintiff's grievance appeal was denied, but a memorandum was issued advising staff to comply with procedures and to take care to ensure efforts are "made to let the inmate view his property being packed and sign the property

---

5. For example, Plaintiff reported that he wrote "an informal grievance concerning the misuse of Inmate Welfare Trust Fund (IWTF) property and also wrote the Florida House of Representatives Committee on Corrections to inform them of this abuse by Walton CI staff." Doc. 109, ex. A, ¶ 23. *See also* doc. 109, ex. N.

slip . . . ." *Id.* That memorandum identified Plaintiff by name and inmate number. *Id.*

Plaintiff submitted another grievance appeal to the Secretary, also filed while Plaintiff was at Walton Correctional Institution, in which Plaintiff complained that lockers were provided for inmates in open population but not in confinement. *Id.* This appeal was similarly denied, but the response advised that "a type of locker ha[d] been approved for disciplinary confinement unit cells" and would "be installed once enough are received by the institution." *Id.*

Another grievance appeal to the Secretary concerned an allegation that cookies sold in the canteen were being taxed and that cookies were a "non-taxable food item" at other institutions. *Id.* Likewise, this appeal was marked as "denied" because Plaintiff did not have any money which with to make purchases at Walton Correctional Institution so he could not have been personally affected by the situation. *Id.* However, the response shows that a discrepancy was "found in the taxing of certain cookie items" and the institution (Walton C.I.) had now corrected the problem. *Id.*

Plaintiff also submitted a copy of an interoffice memorandum issued from the Department of Corrections Central Office to the Assistant Warden at Walton C.I., dated November 2, 1999, which stated that the institutional response to Plaintiff Osterback's grievance did "not adequately address the issues." Doc. 109, ex. E. The memorandum further stated: "Based on contact w/ A. Overstreet & a review of the physical location & size of the bathroom it has been determined access should be allowed for all inmates to use the bathroom in the library. Please advise staff & readdress." *Id.*

Another grievance appeal to the Secretary's office dated August 22, 1999, resulted in Plaintiff's grievance being "approved

for further inquiry." *Id.* The appeal response (concerning Plaintiff's complaint that staff disapproved incoming mail but failed to list the sender's address) advised that the matter had "been received, evaluated and referred to the Warden for appropriate handling and action." *Id.* Several interoffice memorandums were also generated by Plaintiff's appeal and the instructions contained therein were to be provided to mailroom staff so that the senders of returned correspondence were to be notified "at state expense" of the rejection. *Id.*

Another grievance appeal filed by Plaintiff on November 14, 1999, (concerning the hours the law library at Walton C.I. was open) resulted in Plaintiff's appeal being "approved for further inquiry" and referred back to the institution for handling. Doc. 109, ex. E. Plaintiff was informed in a memorandum issued by the Assistant Warden that Plaintiff's grievance appeal 99–631076 was "approved" with the result being that "[b]reaks for library workers have been eliminated." *Id.* A grievance appeal (dated September 29, 1999) to the Secretary in which Plaintiff sought a procedure to be established to provide receipts to confinement inmates for grievance appeals was also "approved for further inquiry." Doc. 109, ex. E. The follow-up interoffice memorandum advised that pursuant to a suggestion from "Central Office staff, the Librarian ha[d] been instructed to date stamp all grievances received from confinement and through the institutional mail with the previous day's date." *Id.; see also* doc. 109, ex. Q.

Additional evidence has been presented through the affidavit of another inmate, Jody Gearhart, who avers that he knew Plaintiff while they were housed at Walton Correctional Institution. Doc. 109, ex. F, ¶ 2. Inmate Gearhart, who worked in the

law library, stated that Assistant Warden Page "frequently visited the law library to discuss problems/complaints raised by [Plaintiff] in his grievances." Doc. 109, ex. F, ¶ 7. Inmate Gearhart states that "[o]n one of [those] occasions Mr. Barge [the librarian at Walton C.I.] suggested that [Plaintiff] should be gotten rid of. Mr. Page replied that they were probably going to transfer him because of all the paperwork he was creating." *Id.*, at ¶ 8. Inmate Gearhart also reported a conversation he had with Mr. Barge in which he told Gearhart to refer Plaintiff's photocopying requests to him because of an issue that had arisen and he had been questioned by Central Office. *Id.*, at ¶ 9.

On March 6, 2000, Plaintiff had filed a grievance appeal to the Secretary's Office concerning the use of the inmate chapel at Walton for an employee Christmas party and an alleged misuse of Inmate Welfare Trust Funds. Doc. 109, ex. G. The appeal was denied, but it reveals that inquiries were made into the "staff Christmas gathering" and funds used to construct the Chapel at Walton C.I. *Id.* Plaintiff also submitted a letter he received from the Committee on Corrections, Florida House of Representatives, while he was housed at Walton Correctional Institution. *Id.* The letter, dated January 12, 2000, indicates that the Committee was "currently monitoring" several issues, "including the alleged deficiencies of the department's current grievance system." *Id.* The letter stated that "[l]egal staff at the department" advised they were working on "a more meaningful and effective grievance system" and that the Warden at Walton C.I. had been contacted regarding "the employee Christmas dinner conflicting with the scheduled chapel service." *Id.*

Plaintiff also complained in a grievance that a letter sent to him from a reporter with the St. Petersburg Times, which Plaintiff contends is "privileged mail" was opened at Walton outside his presence and read in violation of departmental rules. Doc. 109, ex. H. Plaintiff also noted at the top of the appeal that he was proceeding to the next step of the grievance system because his formal grievance had not been responded to within the time permitted. *Id.* The appeal was "returned without action" but stated that "[c]ontact with the institution reflects institutional grievance log number 99–1758 was approved and returned to" Plaintiff several days after Plaintiff wrote the appeal. *Id.* That grievance and resulting response stated that the "occurrence was a fluke." *Id.* "Mail from the media is rare and since it was not marked privileged, it was opened by mistake. Staff had been counseled to be more alert to mail from the media and to handle it in accordance with DC rules." *Id.*

Plaintiff was transferred from Walton Correctional Institution to Santa Rosa Correctional Institution on February 1, 2000. Doc. 109, ex. A, ¶ 4. Plaintiff asserts in his affidavit that Defendant Rhodes began making changes in the library and "began telling inmates that such-and-such a statute or court rule didn't permit the submission of exhibits, as he interpreted the statute or court rule, and would deny photocopying services based on these interpretations." Doc. 109, ex. A, ¶ 37. Plaintiff and Defendant Rhodes had a disagreement over what Plaintiff has characterized as the Defendant's decision to "change the institution's policy on storage of legal property." *Id.*, at ¶ 38. According to Plaintiff, Plaintiff's "refusal to acquiesce in his implementation of unsanctioned policies and practices and [Plaintiff's] decision to challenge them, made Mr. Rhodes openly hostile to" Plaintiff. *Id.*, at ¶ 39. Plaintiff "felt that [Defendant Rhodes] was not only using his experience as an attorney to thwart inmate court access but also as a means to intimidate

inmates from challenging this obstruction of their court access." *Id.*, at ¶ 40.

Plaintiff submitted copies of grievances sent to Defendant Rhodes in April, 2000, in which he complained about decisions made by Defendant Rhodes concerning the denial of copying requests, and the denial of interlibrary loan material. Doc. 109, ex. J. There is also a grievance concerning Defendant Rhodes telling Plaintiff that he and Plaintiff would go through Plaintiff's legal property stored in the law library and Defendant Rhodes would tell Plaintiff what he could store and what he could not. *Id.* Plaintiff was advised on May 15, 2000, that Defendant Rhodes was an attorney.

Plaintiff also asserted that Defendant Rhodes had wrongfully disposed of property that had been either "donated and/or purchased for inmate use in the library . . . ." Doc. 109, ex. A, ¶ 44. Plaintiff filed a grievance concerning disposition of that property by Defendant Rhodes, and stated that Defendant Rhodes "derided" Plaintiff's actions "during a talk in his office." *Id.* Plaintiff also complained that he and Defendant Rhodes "had a heated exchange about him confiscating [Plaintiff's] copy of" the decision in *Osterback v. Ingram. Id.*, at ¶ 46. Plaintiff stated that Defendant Rhodes was aware that Plaintiff had requested that the Inspector General's Office of the Department of Corrections conduct an investigation of Defendant Rhodes's actions. *Id.*, at ¶ 47; *see also* doc. 109, ex. O. Plaintiff further asserted in his affidavit that Defendants Farley and Sloan were aware of Plaintiff's litigation efforts because of changes that were required in the grievance system. Doc. 109, ex. A, ¶¶ 48–49.

Plaintiff states that another inmate filed a public records request to The Florida Bar to obtain Defendant Rhodes's disciplinary action. Doc. 109, ex. A, ¶ 41. "It was then that we learned that Mr. Rhodes had been suspended from the practice of law indefinitely for failure to pay the costs associated with disciplinary action taken by the Supreme Court of Florida." *Id.* Plaintiff and another inmate, McGehee, filed a complaint with The Florida Bar against Defendant Rhodes and claimed that he had engaged in behavior that "met the definition of unlicensed practice of law and/or practice of law by a suspended attorney . . . ." *Id.*, at ¶ 42. Plaintiff saw Defendant Rhodes drafting a response to The Florida Bar Complaint "on the computer in his office." *Id.*, at 45.

Plaintiff provided a copy of the complaint he filed with The Florida Bar. Doc. 109, ex. J. It is a lengthy complaint, dated May 30, 2000, that need not be set forth here except to note that Plaintiff complains that Defendant Rhodes's actions violate "Florida Bar Rule 10–2.1(a) and s. 454.23, Fla. Stat." *Id.* Plaintiff raised complaints about several of Defendant Rhodes's actions and decisions, and Plaintiff complained that he prevented Plaintiff from filing certain documents and interfered with Plaintiff's litigation efforts. *Id.* Plaintiff concluded the complaint by asserting that he had learned that Defendant "Rhodes *was not* an attorney" as he had been suspended by the Florida Supreme Court in 1991, but that he was holding "himself out to be a licensed attorney . . . ." *Id.*

The Florida Bar issued a letter to Plaintiff dated September 7, 2000, which acknowledged a complaint filed by Plaintiff against Defendant Barry Zane Rhodes, in August of 2000. Doc. 109, ex. L. The letter advised that on September 5, 2000, the Bar had "closed the case based on a finding of no Unlicensed Practice of Law." Doc. 109, ex. L.

The deposition testimony of inmate James Scott McGehee reveals that in 2000, while housed at Santa Rosa Correctional Institution, inmate McGehee also filed a

complaint with The Florida Bar against Defendant Rhodes for the unlicensed practice of law. Doc. 109, ex. M, p. 2. Inmate McGehee states that he was not transferred away from Santa Rosa C.I., however, until July of 2002.[6] *Id.* Inmate McGehee states that he used the law library on a regular basis, although his use was restricted and he lost his "job as [a] law clerk as [a] result of the complaint." *Id.*, at 3.

Plaintiff has provided evidence that the transfer order sending him from Walton Correctional Institution to Santa Rosa Correctional Institution was issued by Defendant Doyle Kemp and sent to Defendant Rabion for action on January 27, 2000. Doc. 109, ex. B. Additionally, Plaintiff has given testimony that the transfers made him physically ill from motion sickness, that he was denied "adequate clothing or water" and had "legal files and documents ... confiscated and [Plaintiff] had almost no access to them for 2 weeks." Doc. 109, ex. A, ¶ 50.

Plaintiff states that when he is transferred, "staff at the receiving institution confiscate property which was authorized at the sending institution and [Plaintiff is] deprived of the use of such property until it is returned through the grievance procedure, if at all." *Id.*, at ¶ 51. In support, Plaintiff has provided a grievance appeal in which he complains about having been given "a plastic folder and some binding twine with which to" hold together a Florida Bar publication entitled, "Florida Administrative Practice." Doc. 109, ex. E. The folder and twine were given to him by prison officials because they determined that the original metal binding of the book was not permissible. *Id.* Plaintiff complained that he was allowed to have the

book at Charlotte and Hendry Correctional Institutions, but it was confiscated when he arrived at Walton. *Id.* The grievance appeal was denied, but the response indicated that the "institution [had] advised that they [would] return the pages but the vinyl cover and string [were] considered contraband." *Id.* That grievance appeal resulted in an email-type communication between Central Office and officials at Walton Correctional Institution, as well as a memorandum to Plaintiff from the Assistant Warden, with a copy to Property Sergeant Belser concerning the return of the publication. *Id.*

Furthermore, Plaintiff asserts that he loses "clean time" when he is transferred, meaning that an inmate "must be DR free for at least 1 year before [he] can request a transfer." Doc. 109, ex. A, ¶ 52. "Each transfer re-starts this one-year period." *Id.*

Plaintiff has provided evidence that he has grieved numerous conditions and policies at Hamilton Correctional Institution Main Unit, but after his claims were "exhausted [he] feared bringing these claims against institutional staff would result in [his] transfer." Doc. 109, ex. A, ¶ 53. Plaintiff asserts that his "fear was validated when [he] was transferred in March of 2002 from Hamilton Main Unit to Hamilton Annex" which "mooted" his "claims for declaratory or injunctive relief against the conditions and practices at the Main Unit ...." *Id.*, at ¶ 54. Plaintiff also states that he has grieved conditions at the Annex, and wants "to bring these claims in a civil rights complaint, but fear[s] another transfer if [he brings] such specific claims against institutional staff." *Id.*, at ¶ 55. Plaintiff contends that consequences of his

---

**6.** An "inmate movement/transfer history" for inmate McGehee indicates that he arrived at Santa Rosa C.I. on November 2, 1999, but was transferred back and forth between

R.M.C.—Main Unit several times between February 9, 2001, and December of 2001. Doc. 109, ex. M, p. 4. Nevertheless, inmate McGehee was not immediately transferred.

transfers from Walton Correctional Institution and from Santa Rosa Correctional Institution prevented him from seeking equitable relief and mooted his claims for injunctive relief. *Id.*, at ¶¶ 58–59.

As additional evidence, Plaintiff submitted several of the Defendants' answers to interrogatories. In the interrogatories to Defendant Platt, Plaintiff asked what investigation was made concerning Plaintiff's grievance that he was transferred from Walton Correctional Institution due to retaliation. Doc. 109, ex. T. The response was that no investigation was made into Plaintiff's grievance because Plaintiff "gave no specifics that required further inquiry into your claim of retaliation." *Id.* Further, the answer states that "[a]n institution can make an administrative decision to transfer an inmate for the reasons given." *Id.* A similar question was asked of Defendant Henderson: what investigation was made of Plaintiff's grievance concerning the transfer from Santa Rosa Correctional Institution. Doc. 109, ex. U. Defendant Henderson stated in response that based on Plaintiff's grievance statements and the responses "provided by staff at the institutional level, [Defendant Henderson] did not see where there was a need for further investigation." *Id.*

### III. Analysis

Defendants submit that pursuant to Fla. Stat. § 944.17(7), the Department of Corrections "may transfer prisoners from one institution to another institution in the correctional system and classify and reclassify prisoners as circumstances may require." Doc. 82, p. 9. Pursuant to the authority given under that statute, the following administrative rule was created:

> Upon completion of the reception process, each inmate shall be assigned and transferred to the institution which might best facilitate his institutional progress. Inmates may subsequently be transferred from one institution to

another. Transfers are subject to review by the inmate grievance procedure. Doc. 82, p. 9, *quoting* Fla. Admin. Code R. 33–601.215. That rule was in place at the time Plaintiff was transferred from Walton Correctional Institution to Santa Rosa Correctional Institution in February of 2000. The rule was amended on September 19, 2000, and in its current form, now states:

> Upon completion of the reception process, each inmate shall be assigned and transferred to the institution approved by the State Classification Team that might best facilitate his institutional progress. Inmates may subsequently be transferred from one institution to another; however, the goal of the classification system is to retain inmates at institutions for longer periods of time in order to reduce transfers and stabilize the inmate population. Inmates participating in academic, vocational, substance abuse or betterment programs will not be transferred to another institution prior to completion of the program unless the program is available at the receiving institution, or for purposes of population management *or security and safety concerns specifically set forth in writing.* Transfers are subject to review by the inmate grievance procedure.

Doc. 82, p. 10; *quoting* Fla. Admin. Code R. 33–601.215 (emphasis added). This version of the rule was in place when Plaintiff was transferred from Santa Rosa C.I. to Jackson C.I., and ultimately to Hamilton C.I.

In addition to arguing that summary judgment should be granted in their favor because Plaintiff's transfers were permissible under the rules and served legitimate penological interests, doc. 82, p. 14, Defendants also contend the transfers were not punitive because he "was merely transferred from general population at one in-

stitution to general population at another." *Id.*, at 10. Defendants contend that Plaintiff was not "subjected to any adverse, or punitive action which 'would chill or silence' [Plaintiff's] future First Amendment activities." Doc. 82, p. 12.

It is well established that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). Yet, a prisoner's rights are not absolute. *Shaw v. Murphy*, 532 U.S. 223, 229, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001); *see also Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).

■ Inmates clearly retain protections afforded by the First Amendment. *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Nevertheless, First Amendment rights may be limited by many considerations in the prison setting, "including deterrence of crime, rehabilitation of prisoners, and institutional security." *Pell*, 417 U.S. at 822–823, 94 S.Ct. at 2804; *Procunier v. Martinez*, 416 U.S. 396, 412, 94 S.Ct. 1800, 1810–11, 40 L.Ed.2d 224 (1974), *cited in O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348–49, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). Prisoners, thus, retain only those First Amendment rights that are not inconsistent with their status as prisoners. *Shaw*, 532 U.S. at 229, 121 S.Ct. at 1479.

■ Administration of a penal institution is complex and difficult. *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 126, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1977). Courts must give "substantial deference to the professional judgment of prison administrators" who are in a better position to understand the volatile prison environment and act to prevent disorder. *Overton v. Bazzetta*, 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003), *rehearing denied* —— U.S. ——, 124 S.Ct. 35, 156 L.Ed.2d 693 (2003); *Procunier*, 416 U.S. at 405, 94 S.Ct. at 1807; *Thornburgh v. Abbott*, 490 U.S. 401, 413, 109 S.Ct. 1874, 1881, 104 L.Ed.2d 459 (1989). Accordingly, a federal court must not unnecessarily involve itself in matters of prison administration. *Shaw*, 532 U.S. at 230–31, 121 S.Ct. at 1480.

■ On the other hand, prisoners may not be retaliated against by prison officials for exercising their First Amendment rights. *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir.2003). A prisoner states a viable claim when he alleges that prison officials retaliated against him because he exercised a First Amendment right. *Adams v. James*, 784 F.2d 1077, 1082 (11th Cir.1986); *see also Mitchell v. Farcass*, 112 F.3d 1483, 1490 (11th Cir. 1997) (reversing the district court's dismissal of Mitchell's First Amendment claim for retaliation); *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir.1986); *Bridges v. Russell*, 757 F.2d 1155 (11th Cir.1985) (finding that dismissal was improper concerning prisoner's allegation that he was transferred to another prison in retaliation for exercising First Amendment rights). Moreover, courts have held that being transferred "in retaliation for exercising federal constitutional rights is actionable under § 1983." *Adams v. James*, 784 F.2d at 1082 (acknowledging that "prison officials may not retaliate against an inmate for exercising a constitutionally protected right"), *citing Bridges v. Russell, supra; see also Sisneros v. Nix*, 95 F.3d 749, 752 (8th Cir.1996); *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir.1998) (stating that "prison authorities may not transfer an inmate in

retaliation for the exercise of constitutionally protected rights.").

■ Conduct which is not in itself actionable under § 1983 becomes actionable if undertaken with a retaliatory motive. *Dixon v. Brown,* 38 F.3d 379 (8th Cir.1994) (finding that "[a]lthough the filing of a false disciplinary charge is not itself actionable under § 1983, the filing of a disciplinary charge becomes actionable if done in retaliation for the inmate's filing of a grievance.") Thus, actions which in themselves are not constitutionally impermissible but which are done "in retaliation for filing lawsuits and administrative grievances ... violates both the inmate's right of access to the courts ... and the inmate's First Amendment rights. *Wright,* 795 F.2d at 968 (internal citations omitted). Accordingly, injury may be "the retaliatory accusation's chilling effect on" a First Amendment right, rather than a specific harm such as additional confinement or the deprivation of privileges. *See Hines v. Gomez,* 108 F.3d 265, 269 (9th Cir.1997) (finding that filing false charges against an inmate infringes on the inmate's "First Amendment right to file prison grievances.")

■ The problem in these cases, however, is not in stating what the claim is, but analysis of motive. These are mixed-motive cases. The difficult issues are whether there is a causal connection between a prisoner's First Amendment activity and the adverse action taken against him, and whether the Defendant's motive is permissible or impermissible. The Eleventh Circuit has not adopted a formal method of analysis of causation as yet, except to say that a prisoner does not have to prove that he would not have been transferred "but for" his assertion of his constitutional rights. *Adams v. Wainwright,* 875 F.2d 1536, 1537 (11th Cir.1989).

It is recommended, however, that in this case the court use the analytical framework adopted by Magistrate Judge Rodgers of this district. *See Pate v. Peel,* 256 F.Supp.2d 1326 (N.D.Fla.2003) (on consent). Judge Rodgers applied the standard for analyzing § 1983 First Amendment claims in the public employment setting. 256 F.Supp.2d at 1337, applying the methods of *Pickering v. Bd. of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *Pickering* and *Mount Healthy* set forth a four step analytical framework: (1) whether as a matter of law the speech at issue may be fairly characterized as involving a matter of public concern; (2) whether as a matter of law the employee's interest in such free speech outweighs the interest of the state in promoting the efficiency of the public services it performs through public employees; (3) whether there is a substantial causal link between the speech and the adverse employment action; and (4) whether the employer has shown that it would have made the same decision based upon its legitimate reason, standing alone (that is whether the plaintiff would have suffered the adverse action "but for" the exercise of his First Amendment rights). 256 F.Supp.2d at 1337–1338. While a prison is a different setting from a place of public employment, there is no good reason for there not to be some uniformity.

The framework adopted by Judge Rodgers is derived in large part from the Sixth Circuit's opinion in *Thaddeus–X v. Blatter,* 175 F.3d 378 (6th Cir.1999), a case which Defendants urge as the standard for this court's decision. That court modified the first three elements of conventional *Pickering* and *Mount Healthy* analysis:

A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse ac-

tion was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two— that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

175 F.3d at 394. The court explained that the second element was drawn from employment law. 175 F.3d at 396–398. Recognizing that "[p]risoners may be required to tolerate more than public employees," the court said that "[r]etaliation against a prisoner is actionable if it is capable of deterring a person of ordinary firmness from exercising his or her right to access the courts." *Id.*, at 398. The court then adopted the fourth step in *Pickering* and *Mount Healthy*:

> Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the Defendant.... If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment.

175 F.3d at 399, *citing Mount Healthy*.

Two other circuits have applied the *Pickering* and *Mount Healthy* test to First Amendment claims of retaliation in the prison setting. *Rauser v. Horn*, 241 F.3d 330, 333–334 (3d Cir.2001); *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir.1998); *Babcock v. White*, 102 F.3d 267, 275 (7th Cir.1996). The Sixth Circuit still follows *Thaddeus–X*. *Bell v. Johnson*, 308 F.3d 594, 609 (6th Cir.2002). Two other circuits have not adopted a burden-shifting framework, but use a more stringent "but for" analysis. *See Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir.1998) (requiring prisoner to "prove that 'but for' the retaliatory motive, the incidents" which he claims were retaliatory "would not have taken place."); *Goff v. Burton*, 7 F.3d 734, 737 (8th Cir.1993), *cert. denied* 512 U.S. 1209, 114 S.Ct. 2684, 129 L.Ed.2d 817 (1994) (declining to use *Mount Healthy* analysis in retaliatory transfer case and applying the more stringent "but for" test; "prisoner must prove that retaliation was the actual motivating factor for the transfer."). The Eleventh Circuit, however, has rejected this "but for" standard for Plaintiff's proof, as noted above, so these decision are not persuasive.

In an unpublished opinion, the Eleventh Circuit has, however, used a modified version of the first three elements adopted in *Thaddeus–X*. *William Steward Steele v. Charles Moorman*, No. 02–11638, opinion dated February 28, 2003. That opinion, attached as exhibit A to document 92, finds that to state a claim of retaliation a prisoner must show "that (1) he engaged in protected conduct; (2) he suffered an adverse action; and (3) there is a causal connection between the two." *Id.*, p. 3. The court cites to *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571 (11th Cir.2000), which concerned a retaliation claim in the Title VII employment context.

In *Texas v. Lesage*, 528 U.S. 18, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999), the United States Supreme Court utilized the *Mount Healthy* framework in considering a § 1983 claim challenging an allegedly race-conscious admissions process which the plaintiff claimed violated the Equal Protection Clause. The Supreme Court concluded that summary judgment should not have been granted because the appellate court did not employ the "Court's well-established framework for analyzing such claims" under *Mount Healthy*. *Lesage*, 528 U.S. at 20, 120 S.Ct. at 468. The Court noted that even though Title VII claims "typically involved alleged retaliation for protected First Amendment activity rather than racial discrimination, ...

that distinction [was] immaterial." 528 U.S. at 20–21, 120 S.Ct. at 468. "The underlying principle is the same: The government can avoid liability by proving that it would have made the same decision without the impermissible motive." *Id.*

For these reasons, it is recommended that the framework established in the Sixth Circuit in *Thaddeus–X* be applied in the case at bar. Applying this formula in this case, Plaintiff must first demonstrate (1) that he engaged in protected First Amendment activity, (2) suffered an adverse action because of that activity, and (3) show a causal connection between the two. If Plaintiff comes forward with such evidence, the burden will then shift to Defendants to prove that they would have transferred Plaintiff anyway for legitimate reasons. Since this is Defendants' motion for summary judgment, however, and Plaintiff has the ultimate burden of proof, Defendants need only point to evidence as to the legitimate reason and Plaintiff must show that there is a genuine dispute of material fact concerning Defendants' defense.

 Plaintiff has come forward with evidence to show the first element of his claim. "Litigation undertaken in good faith by a prisoner motivated to bring about social change and protect constitutional rights in the prison is a 'form of political expression' and 'political association'" is protected First Amendment activity. *Adams,* 784 F.2d at 1081. Defendants have not challenged Plaintiff's conduct as not being protected by the First Amendment. Doc. 82, p. 12. Accordingly, the first element in Plaintiff's claim is not in dispute.

Defendants argue that Plaintiff has not satisfied the second element because he did not suffer any adverse consequences

and his transfers were "not punitive." Defendants contend that the prison transfers should not be considered adverse unless Plaintiff was sent to a psychiatric facility or suffered a loss of privileges. Doc. 82, p. 13, *citing Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), *quoted in Mandela v. Campbell,* 181 F.3d 102, 1999 WL 357825 (6th Cir.1999) (unpublished opinion); *Ward v. Dyke,* 58 F.3d 271 (6th Cir.), *cert. denied* 516 U.S. 991, 116 S.Ct. 524, 133 L.Ed.2d 431 (1995).

With due respect, *Sandin* analysis does not apply to a First Amendment retaliation claim. In *Mandela,* the court appears to have granted summary judgment in favor of the defendant prison warden because he presented a legitimate justification for the transfer—"prison security and order." 1999 WL 357825, *3 (6th Cir. 1999). The court discussed the fact that the transfer "did not even involve a change in security level—[but] was merely one of the 'ordinary incidents of prison life'" as a supplemental basis for affirming the district court. *Id.* Although it is arguable whether the primary basis for the holding in *Mandela* was based on *Sandin v. Conner* or the legitimate interest in prison security as permitted by *Turner v. Safley,* and giving deference to the professional decisions of prison administrators, that point need not be discussed at great length.

The claim here arises under the First Amendment, not the Due Process Clause under the Fourteenth Amendment. *See Adams,* 784 F.2d at 1080 (stating "[t]he lack of entitlement to a particular privilege does not free prison administrators to grant or withhold the privilege for impermissible reasons.").[7] Those are separate claims. *See, e.g., Allah v. Seiverling,* 229 F.3d 220, 224 (3d Cir.2000) (concluding

---

7. It is acknowledged that in *Adams,* the court deemed the transfer to be to a more punitive institution. 784 F.2d at 1078. There was no additional discussion of that point.

"that Allah's claim alleging denial of his constitutional right to meaningful access to the courts is not foreclosed by *Sandin.*"), *citing Babcock v. White,* 102 F.3d 267, 274–75 (7th Cir.1996).

Likewise, in *Hall v. Sutton,* 755 F.2d 786 (11th Cir.1985), the Eleventh Circuit found that where a claim concerned the removal of property, which would not be a valid due process claim under *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the inmate's allegation of a constitutionally improper retaliatory motive in taking his tennis shoes permitted the First Amendment claim to proceed. *Hall,* 755 F.2d at 787. "With the retaliation assertion, the claim is no longer a mere due process claim, but rather implicates Hall's constitutional right to meaningful access to the courts." *Id. Sandin* analysis does not apply to a First Amendment retaliation claim.

Additionally, in *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), an inmate alleged that he was removed from his job as an inmate law clerk and transferred to another prison as retaliation. The Supreme Court held that inmates had no due process right to hearings prior to prison transfers and no right to remain at any particular prison facility. *Montanye,* 427 U.S. at 242–243, 96 S.Ct. at 2547–2548. The majority opinion of the Court discussed only whether the protections of the Due Process Clause were implicated, and not the separate and distinct retaliation claim. *See also Meachum v. Fano,* 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976) (holding that "[w]hatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all."); *Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) (permitting interstate prison transfers without due process hearings). However, the dissenting opinion by Justice Stevens, in which he was joined by Justices Brennan and Marshall, noted that although there were apparently no material differences between the facility where the inmate had been housed and the one to which he was sent, that fact was of no consequence. *Montanye,* 427 U.S. at 244, 96 S.Ct. at 2548.

> I agree with the Court that the transfer did not cause him a grievous loss entitling him to a hearing. In my opinion this conclusion is unaffected by the motivation for the transfer, because I think it is the seriousness of its impact on the inmate's residuum of protected liberty that determines whether a deprivation has occurred.

*Id.,* at 244, 96 S.Ct. at 2548.

Plaintiff asserted in the complaint that his transfer to Santa Rosa Correctional Institution was adverse because that institution "was a higher security camp" and had "little or no programs or recreation facilities, unlike Walton Correctional Institution." Doc. 75, p. 23. Defendants have not addressed this allegation. Additionally, Plaintiff asserts in his affidavit that his transfers resulted in the deprivation of property "until it is returned through the grievance procedure, if at all." Doc. 109, ex. A, ¶ 50–51. Defendants have not addressed this evidence. Plaintiff has also shown that a transfer re-starts the count of a one-year period of time, such that Plaintiff is unable to request a transfer to an institution close to his home. Doc. 109, ex. A, ¶ 52. Furthermore, Plaintiff states that a transfer results in his inability to seek declaratory and injunctive relief in court because those claims become moot. *Id.,* at ¶ 54, 57.

█ A "widely accepted standard for" determining whether conduct may be deemed "adverse" in evaluating First Amendment retaliation claims is on whether the action is "capable of deterring a person of ordinary firmness from exercising his or her right to access the courts." *Thaddeus–X,* 175 F.3d at 398; *see also, e.g., Crawford–El v. Britton,* 93 F.3d 813, 826 (D.C.Cir.1996), rev'd on other grounds, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001); *Toolasprashad v. Bureau of Prisons,* 286 F.3d 576, 585 (D.C.Cir.2002);[8] *Brown v. Crowley,* 312 F.3d 782, 787 (6th Cir.2002).

Defendants suggest that the First Amendment was not violated because it is unlikely that the transfers have or will deter Plaintiff from exercising his First Amendment rights since Plaintiff has a history of vigorous pursuit of grievances and litigation. Doc. 82, p. 14. Defendants assert that, by Plaintiff's "own admission," he has "filed at least five (5) lawsuits since November[,] 2000." Doc. 82, p. 15, *citing* Plaintiff's amended complaint, doc. 75, pp. 13–14.

The test is an objective one, however, and asks whether a person of ordinary firmness would be deterred. That Plaintiff may be less deterred than others is irrelevant.[9]

Additionally, even if the test were a subjective one, Plaintiff's verified complaint alleged that the numerous transfers he had experienced caused him to forego filing complaints challenging conditions at Walton and Santa Rosa Correctional Institutions due to his fear of additional transfers. Doc. 75, pp. 28–31. Plaintiff also stated in his affidavit submitted in opposition to summary judgment, doc. 109, ex. A, ¶ 55, that he would like to bring claims against conditions at Hamilton Correctional Institution, but "fear[s] another transfer if" he does bring "specific claims against institutional staff." In other words, construing Plaintiff's complaint and the evidence presented in the light most favorable to Plaintiff, it appears that while Plaintiff has litigated general matters within the Department of Corrections, he avoids bringing claims specific to officials at Walton Correctional Institution.

█ "Whether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a question of fact." *Bell v. Johnson,* 308 F.3d 594, 603 (6th Cir.2002), *citing Thaddeus–X,* 175 F.3d at 398–99; *Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999) (noting that question of whether one-day denial of inmate's exercise opportunities was *de minimis* was "factual in nature"). Plaintiff's complaint, sworn and subscribed under penalty of perjury, along with his affidavit submitted in response to summary judgment, indicate a basis for the second element of a retalia-

---

**8.** In *Toolasprashad,* the court stated: "The relevant question is not whether a transfer actually interferes with a particular prisoner's ability to exercise his rights but whether the threat of a transfer would, in the first instance, inhibit an ordinary person from speaking." 286 F.3d at 585.

**9.** Plaintiff admits that he filed an action in state court on November 7, 2000, which challenged a departmental rule as an invalid exercise of delegated legislative authority. Doc. 75, p. 13. Plaintiff filed a second action in state court on November 27, 2000, challenging an "agency photocopy rule." *Id.* A § 1983 case was filed in this Court approximately March of 2001 concerning another challenge to an agency rule. *Id.,* at 14. Another state court case was filed in 2001 "concerning institutional mail procedures." *Id.* In 2002, Plaintiff filed an appeal to a Florida district court, and a petition for writ of mandamus to the Florida Supreme Court seeking an order requiring the Department of Corrections "to process rulemaking petition." *Id.*

tion claim, an adverse action. The factual determination of the "adverse action" requirement is not a matter of law, but a question of fact better left to the jury. *Thaddeus–X,* 175 F.3d at 398; *Bell,* 308 F.3d at 603. The dispute of fact on this issue should be resolved by a jury.

As for the third element, Plaintiff alleged that each of the named Defendants were causally connected to the transfers. Defendants have not challenged this allegation. The evidence shows that Plaintiff was in fact transferred as a consequence of complaints, grievances, and other First Amendment activity. Therefore, on summary judgment there is no genuine dispute of fact as to the third element.

The burden, therefore, shifts to Defendants to point to evidence that the same transfer decisions would have been made in the absence of the protected speech. Here, Defendants must show a "legitimate reason, standing alone," to transfer Plaintiff.

Defendants have argued that summary judgment should be granted in their favor because Plaintiff's transfers "served legitimate penological interests." Doc. 82, p. 14. Defendants submitted evidence showing that the first transfer recommendation (sending Plaintiff from Walton to Santa Rosa Correctional Institution) was made because several disciplinary reports against Plaintiff were not processed, were disapproved, or were overturned. Defendants contend that because the disciplinary actions were not carried out, the administration at Walton Correctional Institution believed it had lost credibility with Plaintiff.

Defendants have not proved a *Mount Healthy* defense at step four. Defendants must show that they would have transferred Plaintiff "even in the *absence* of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576 (emphasis added); *Brochu v. City of Riviera Beach,*

304 F.3d 1144, 1157 (11th Cir.2002); *Thaddeus–X,* 175 F.3d at 399. In other words, Defendants' loss of credibility with Plaintiff was caused by Plaintiff's success in pursuit of complaints, grievances, and grievance appeals. The protected activity in this case cannot be untangled from the decision to transfer Plaintiff to Santa Rosa Correctional Institution.

This result, however, fails to apply the deference which must be accorded prison officials. There must be a fifth step that is needed in the analysis, to test the result against the admonition of the Supreme Court, most recently reiterated in *Overton v. Bazzetta, supra,* that courts must give "substantial deference to the professional judgement of prison administrators" who are in a better position to understand the volatile prison environment and act to prevent disorder. In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court commented on these concerns:

> Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment, and despair are commonplace. Relationships among the inmates are varied and complex and perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner. It is against this background that disciplinary proceedings must be structured by prison authorities; and it is against this background that we must make our constitutional judgments, realizing that we are dealing with the maximum security institution as well as those where security considerations are not paramount. The reality is that disciplinary hearings and the imposition of disagreeable sanctions necessarily involve confrontations between inmates and authority and between inmates who are being disciplined and those who would charge or furnish evidence against them. Re-

taliation is much more than a theoretical possibility; and the basic and unavoidable task of providing reasonable personal safety for guards and inmates may be at stake, to say nothing of the impact of disciplinary confrontations and the resulting escalation of personal antagonism on the important aims of the correctional process.

*Wolff,* 418 U.S. at 562, 94 S.Ct. at 2977–78.

In *Ward v. Dyke, supra,* the court held that where there was evidence that the plaintiff-inmate had filed some 115 grievances in a period of approximately four months, and "that the sheer volume of Ward's complaints interfered with prison administration and caused tension among staff." 58 F.3d at 274. The Sixth Circuit noted that transfers to avoid "tension between staff and a prisoner" was a valid reason. *Id.* "The ability to transfer a prisoner who is interfering with prison administration and staff morale goes to the essence of prison management." *Id.* Thus, a transfer designed to "give prison staff a respite from [a] continuous barrage of grievances, ... is not an impermissible reason for a transfer." *Id.* Although those comments were made in the course of discussing the Due Process Clause, they reveal the legitimate penological interest at stake: "[b]y transferring Ward, defendants were able to maintain the peaceful management of the prison by reducing the tension between the staff and Ward without discouraging him from seeking redress of his grievances." *Id.; see also Smith v. Campbell,* 250 F.3d 1032, 1037 (6th Cir. 2001) (noting that "while a prisoner may have a right to file grievances against prison officials, he or she cannot exercise that right in a manner that violates legitimate prison regulations or penological objectives.").

The troubling feature of this case is that Plaintiff was right every time, and the officials at Walton Correctional Institution apparently were properly corrected as a result of his exercise of his First Amendment rights. Still, it is probable that when multiple disciplinary reports are invalidated, an inmate may begin to develop the impression that he has gained the upper hand and will no longer follow the orders of correctional officers. It is also possible that an inmate may become resentful toward correctional officers after being the target of a series of invalid disciplinary actions. Further, after several unsuccessful attempts to impose discipline, correctional officers may become hesitant to initiate what would be proper disciplinary actions.

Prison security and safety depends entirely upon whether correctional officials have full and continuous control over the inmates in their custody. Control cannot be maintained if there is a lack of respect or resentment on either side, or a belief by the prisoner that he or she has a special status not enjoyed by other prisoners. Any breakdown in that authority, such as a loss of credibility of the supervising correctional officers, compromises legitimate penological interests.

Thus, Defendants have shown without genuine dispute of fact that they had a legitimate reason for transferring Plaintiff away from Walton Correctional Institution. Plaintiff has not shown that other inmates would not have been transferred under similar circumstances. Nor has he shown that the reasons stated for his transfer were false or contrary to normal Department of Corrections policies. Accordingly, it is recommended that the court find that Plaintiff's First Amendment claim of retaliation for the transfer from Walton to Santa Rosa Correctional Institution fails.

The court turns to the second claim, the transfer from Santa Rosa Correctional Institution to Hamilton Correctional Institution. Defendants argue generally that this

transfer served a legitimate penological reason, and was "in the best interest of, and for the security and order of" the Institution. Doc. 82, p. 14. But the only specific basis put forward to justify Plaintiff's transfer is Defendants' assertion that Plaintiff "was transferred from Santa Rosa Correctional Institution because he had created a hostile environment with the librarian by filing a baseless bar complaint, among other things." Doc. 82, p. 16.

In support of that assertion, Defendants provided evidence which shows that Defendant Rhodes, the librarian, requested Plaintiff's transfer because of the tension which existed as a result of Plaintiff's allegations to The Florida Bar. Defendant Rhodes was forced to deal with Plaintiff several times a day because Plaintiff was a frequent visitor to the library. Defendant Beasly also recommended Plaintiff's transfer and stated that it was in "the best interest of [the Institution] and the library to" transfer Plaintiff "due to the inappropriate action on Inmate Osterback's part." The transfer recommendation was approved through the chain of command.

Defendant Rhodes's memorandum, asking that Plaintiff be transferred because Plaintiff filed the Bar complaint, is "probative of the true reasons for" Plaintiff's transfer, simply because Plaintiff filed the Bar complaint. *Rouse v. Benson,* 193 F.3d at 941. The evidence reveals that Defendant Rhodes wrote the memorandum on September 23, 2000. The evidence, however, also indicates that Plaintiff's complaint was not filed with the Bar until August, 2000, and had been dismissed by the Bar on September 7, 2000, several weeks before Rhodes asked that Plaintiff be transferred. A reasonable jury might question Defendant Rhodes' asserted rea-

son that Plaintiff's allegations caused him "to devote a considerable amount of [his] own personal time [in] addressing those false allegations." Plaintiff's evidence disputes that statement in both the amount of time, and that he used his own time to defend himself.[10]

Further, Plaintiff submitted evidence that another inmate, McGehee, also filed a complaint against Defendant Rhodes with The Florida Bar, that the other inmate spent a substantial amount of time in the library and, indeed, was an inmate law clerk, but that McGehee was not immediately transferred as a result of filing the Bar complaint. A jury might reasonably conclude that if security and order had really been threatened or compromised by Plaintiff's actions in filing the Bar complaint, then the other prisoner would have been transferred away from the institution as quickly as Plaintiff was transferred.

Inmates have First Amendment rights which are, admittedly, limited. It is accepted that those rights may be curtailed to avoid a "disruption of prison order or stability." *Castle v. Clymer,* 15 F.Supp.2d 640, 660–61 (E.D.Pa.1998) (holding, after a bench trial, "that defendants unconstitutionally transferred plaintiff in retaliation for his exercise of constitutional rights"). However, there must be some demonstration of the disruption in the prison. Defendants have not explained how the security and order of the Institution was or could be impacted based on Plaintiff's submission of a complaint with The Florida Bar against one employee of the institution. While some circumstances may be self evident, this one is not. Defendants must do more to explain the basis for the transfer decision than to state as a conclu-

---

**10.** Further, review of Plaintiff's Bar complaint reveals that Plaintiff's allegations concerned actions taken by Defendant Rhodes in his employment as Librarian with the Depart-

ment and in holding himself out to be an attorney, although Defendant Rhodes's claimed that Plaintiff's complaint had nothing to do with his job.

sion, without specifics, that the decision was based upon a legitimate penological reason and in the interest of security and order. *See McNamara v. Moody*, 606 F.2d 621, 624 (5th Cir.1979), *cert. denied* 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980). Defendants must explain how Plaintiff's complaint to The Florida Bar could have affected the operations, order, or security of the institution.

A legitimate penological reason for the transfer must be more than stating that Plaintiff filed a complaint challenging the actions of a prison official which were troubling to the official. Otherwise, the justification does little more than point to an unlawful basis for the transfer decision. In this case, the asserted reason leads directly to the conclusion that Plaintiff was transferred to a different prison *because* he has engaged in what Defendants have admitted was protected First Amendment conduct. *See Rouse v. Benson*, 193 F.3d 936, 941 (8th Cir.1999) (distinguishing *Ward v. Dyke, supra,* and holding that the inmate was transferred in retaliation for exercising his constitutional rights and finding that "[a] reasonable jury could find that the reasons for Rouse's transfer ... were merely post hoc responses to anticipated challenges to the transfer.").

It is conceivable that tense feelings developed between Defendant Rhodes and Plaintiff due to the Bar complaint. However, prison officials are called upon to act in a professional manner and separate themselves from comments and allegations that may be made by the prisoners they supervise. In *Procunier v. Martinez, supra,* overruled on other grounds by *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)(requiring the *Turner v. Safley* standard), the Supreme Court instructed that "[p]rison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate

statements." 416 U.S. at 413, 94 S.Ct. at 1811. Actions taken by prison officials must be shown to further "one or more of the substantial governmental interests of security, order, and rehabilitation." *Id.* While *Thornburgh* acknowledged that *Procunier* did not "afford prison officials sufficient discretion" in protecting prison security and held that regulations affecting First Amendment rights must be analyzed using the *Turner v. Safley* analysis, the admonition of *Procunier* has not been altered. *Thornburgh*, 490 U.S. at 413, 109 S.Ct. at 1881.

Following the guidance of *Procunier*, the Fifth Circuit held in *McNamara v. Moody, supra,* that prison officials had to show the impact of a decision on "one or more of the substantial governmental interests of security, order, and rehabilitation." 606 F.2d at 623. The court declined to accept the contention that disrespectful comments made about a prison official in a letter to an outside person "would result in 'a total breakdown in prison security and discipline.'" *Id.,* at 624.

Similar to the Supreme Court's finding in *Procunier* that prison officials had not provided an adequate justification to censor mail "containing 'disrespectful comments' or 'derogatory remarks', or statements that 'magnify grievances' or 'unduly complain,'" it is noted in this case that the Defendants have not provided "any indication of what causal relationships there could be between" Plaintiff's outside complaint to the Bar and internal prison security. *McNamara*, 606 F.2d at 624, *citing Procunier*, 416 U.S. at 415–16, 94 S.Ct. at 1812.

No one wants to be the target of insulting remarks like those in McNamara's letter. But coarse and offensive remarks are not inherently breaches of discipline and security, nor is there any

showing that they will necessarily lead to the breaking down of security or discipline.

606 F.2d at 624, *citing Procunier,* 416 U.S. at 413, 94 S.Ct. at 1811; *see also Loggins v. Delo,* 999 F.2d 364, 367 (8th Cir.1993) (relying on *McNamara* and holding that prisoner's letter did not implicate security concerns, and threats of disciplinary action violated the First Amendment); *Brooks v. Andolina,* 826 F.2d 1266, 1268 (3d Cir. 1987) (disciplining inmate for his statements about a corrections officer in a letter to the NAACP violates the First Amendment), *cited in Osterback v. Ingram,* 2000 WL 297840, at *3, Case No. 3:96cv580/LAC/SMN (N.D.Fla., Jan. 12, 2000).

The court is left, therefore, only with the probability that the relationship between Rhodes and Plaintiff was strained by the complaint to The Florida Bar. That complaint, however, was quickly resolved in favor of Rhodes. This is analogous to Rhodes having been the subject of a single grievance, and one that ended in his favor. This is quite different from the transfer decision from Walton Correctional Institution, where there is evidence that Plaintiff's relationship generally with correctional officers and the administration at the institution had become strained due to a series of successful grievances. It is very doubtful that the Florida Department of Corrections has a policy of transferring every prisoner who files a single grievance under the theory that by filing a single grievance the prisoner has thereby poisoned his relationships with all correctional officers at the institution.

Stated another way and using the *Mount Healthy* test, Defendants have not shown that they would have transferred Plaintiff anyway even had he not filed a complaint against Defendant Rhodes. Therefore, Defendants are not entitled to prevail on summary judgment concerning Plaintiff's transfer from Santa Rosa Correctional Institution to Hamilton Correctional Institution.

**Defendants Greene, Henderson, and Platt**

Defendants have also argued in the supplement to the special report, doc. 85, that Defendants Greene, Henderson, and Platt cannot be held liable for denying or signing Plaintiff's appeals. Doc. 85. Defendants contend that merely responding to a grievance appeal is insufficient to show a causal connection to Plaintiff's claims of retaliation. Plaintiff's response to summary judgment makes clear that Defendants Platt, Greene and Henderson were sued because they failed to investigate Plaintiff's grievances in which he alleged retaliatory transfers. Doc. 109, p. 16.

The only evidence Plaintiff presented to show how those Defendants were involved were the answers to Plaintiff's interrogatories. Defendant Platt responded to a grievance concerning the transfer from Walton to Santa Rosa Correctional Institution. Because the evidence is insufficient to show that this first transfer was retaliatory, the claim against Defendant Platt is insufficient. Summary judgment should be granted in favor of Defendant Platt.

As for the interrogatory concerning Defendant Henderson, that claim concerns the transfer to Hamilton Correctional Institution, which is a viable claim. Defendant Henderson stated in his response to Plaintiff's interrogatories that he determined there was no need for further investigation in Plaintiff's grievance. Review of Plaintiff's grievance to that Defendant, presented as exhibit F to the complaint, doc. 75, reveals that Plaintiff claimed that he was transferred because of his litigation and administrative efforts, not as a "special review" transfer. In light of Plaintiff's assertions in the grievance, a reasonable response would have been to review the

transfer recommendation to see if Plaintiff's claim was true. That recommendation stated that Plaintiff was a special review transfer, but also specifically stated that the transfer recommendation was based on Plaintiff's allegedly having made "frivolous allegations against Mr. Rhodes." That comment should have raised the so-called "red flag" to determine if there was any merit to Plaintiff's grievance, and whether this was the only reason for the transfer. Construed in a light most favorable to Plaintiff, it is concluded that Plaintiff has presented evidence showing Defendant Henderson's personal involvement in the events surrounding the transfer to Hamilton C.I. Summary judgment should be denied as to Defendant Henderson.

However, Plaintiff did not come forward with any specific evidence showing how Defendant Greene was involved. Plaintiff stated in his response to summary judgment that "Defendant Greene signed each of [the] grievances" and should be "responsible for the content of Defendant Platt and Henderson's responses." Doc. 109, p. 16. That is not sufficient. Therefore, summary judgment should be granted as to Defendant Greene.

As for the argument concerning Defendant Kemp, Plaintiff did not address that claim. Notably, there was confusion on that point in the motion to supplement, doc. 85, but nevertheless, Plaintiff articulated that Defendant Kemp has final approval of all transfers. Doc. 75. That claim was not challenged and the claim against Defendant Kemp should proceed.

## Qualified Immunity

Defendants have argued their entitlement to qualified immunity. Doc. 82, p. 16. As noted *supra*, it has been well established in this circuit that an inmate may not be transferred for punitive or retaliatory reasons. *See, e.g., Bridges v. Russell*, 757 F.2d 1155 (11th Cir.1985) (holding that a prisoner stated a claim of retaliation based on the prisoner being transferred to another facility even though prisoners do not have a liberty interest in remaining at a particular facility), *cited in Thomas v. Evans*, 880 F.2d 1235, 1242 (11th Cir. 1989); *Adams v. James*, 784 F.2d 1077 (11th Cir.1986); (holding that the inmate presented evidence "that, if true, would clearly indicate that [the defendant] filed disciplinary reports against [the plaintiff] in retaliation for [plaintiff's] earlier litigation."). *Harris v. Ostrout*, 65 F.3d 912 (11th Cir.1995). That principle of constitutional law was well established at the time of the events in question. "If prison officials cannot censor unflattering statements made in letters to outsiders, they also may not punish an inmate for the contents of such letters." *Brooks v. Andolina*, 826 F.2d 1266, 1268 (3d Cir.1987) (relying on *McNamara v. Moody, supra*). Thus, Defendants are not entitled to qualified immunity.

## Relief

Defendants have argued that Plaintiff is not entitled to injunctive or declaratory relief. However, the argument is based on the standard "criteria for obtaining preliminary injunctive relief." Doc. 82, p. 18, *citing Snook v. Trust Co. of Georgia Bank of Savannah, N.A.*, 909 F.2d 480, 483 (11th Cir.1990) (affirming the denial of motion for preliminary injunction). To the degree Defendants argue Plaintiff lacks standing under Article III, the argument is fallacious. Moreover, the contention that Plaintiff has not suffered a violation of his constitutional rights should be determined by a jury. Summary judgment is denied as to these defenses.

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendants' motion for summary judgment, doc. 82, supplemented by doc. 85, be **DENIED in part** and the claims against Defendants Rhodes, Sloan, Beasly, Farley, Henderson,

Workman, and Kemp concerning the transfer to Hamilton Correctional Institution proceed to trial. It is further **RECOMMENDED** that Defendants' motion for summary judgment, doc. 82, supplemented by doc. 85, be **GRANTED in part** as to the claims against all Defendants concerning the transfer to Santa Rosa Correctional Institution, and against Greene for the transfer to Hamilton Correctional Institution. It is further **RECOMMENDED** that this case be **REMANDED** to the undersigned for further proceedings prior to setting this case for trial.

Sept. 12, 2003.